# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **NERISSA PRECIOSO, JAN VINCENT AUSTRIA, PATRICK BORJA, LIZALYNN CABRAL, JOY CHUA, MARIE JODEL MONTALVO, and VINCENT ZAULDA,** on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | **Case No. _____** |
| | ) | **CLASS ACTION** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **JURY DEMAND** |
| **NATIONAL HEALTH CORPORATION, JEFFREY R. SMITH, and MARIA WONG; INFINITY CARE PARTNERS, LLC; and JOHN DOES 1-10,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## CLASS ACTION AND COLLECTIVE ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, allege as follows:

## I. INTRODUCTION

1. This is an action for damages, injunctive relief, declaratory relief, and other remedies for violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589 *et seq.*; the Tennessee Human Trafficking Act (THTA), Tenn. Code Ann. § 39-13-314; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Section 1981); the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*; and other federal and state law.

2. Defendants National Health Corporation (NHC) and Infinity Care Partners, LLC (ICP) are Tennessee companies, one a national nursing home company and the other a foreign

labor recruiter, who together have recruited hundreds of nurses in the Philippines to work at NHC facilities throughout the United States.

3.     Together, they have built multi-million-dollar businesses on the backs of the indentured servitude of these foreign nurses, who are lied to, underpaid, and forced to work in unsafe conditions, putting their careers, their professions, and their patients' health and safety in jeopardy.

4.     To keep the nurses from leaving, Defendants have commenced or threatened baseless legal action, changes to immigration status, and serious financial harm if these nurses stop working for Defendants.

5.     They do this in part through illegal contracts that offer no way for the nurses to leave their employment and demand upwards of $40,000—often more than these nurses' net annual pay—should the nurses stop working for Defendants for any reason.

6.     Therefore, Plaintiffs bring this Complaint, on behalf of themselves and all other similarly situated individuals, seeking an injunction prohibiting Defendants from threatening to enforce or enforcing financial or other harms against themselves and all similarly situated individuals; a declaration that the illegal contracts used by Defendants are in violation of state and federal law; actual, compensatory, and punitive damages; an award of reasonable attorneys' fees and costs; and such other relief as the Court deems just and proper.

## II.     JURISDICTION & VENUE

7.     This Court has original subject matter jurisdiction over TVPA, RICO, and Section 1981 claims pursuant to 28 U.S.C. § 1331, because they arise under the Constitution and laws of the United States.

8.      This Court has supplemental jurisdiction over THTA claims pursuant to 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

9.      This Court has personal jurisdiction over Defendants National Health Corporation and Infinity Care Partners because they are business entities organized under the laws of the state of Tennessee, are headquartered and operate physical locations and employ workers in Tennessee, and conduct business throughout Tennessee.

10.     A substantial part of the events or omissions giving rise to these claims occurred in Davidson and Rutherford Counties, Tennessee, within this judicial district.  Therefore, proper venue for this action lies within the Middle District of Tennessee pursuant to 28 U.S.C. § 1391.

### III.     PARTIES

11.     Plaintiff Nerissa Precioso is a citizen of the Philippines and permanent resident of the United States who resides in Sumner County, Tennessee.  She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from October 2022 to April 2023.

12.     Plaintiff Jan Vincent Austria is a citizen of the Philippines and permanent resident of the United States who resides in Pennsylvania.  He is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from October 2022 to April 2023.

13.     Plaintiff Patrick Borja is a citizen of the Philippines and permanent resident of the United States who resides in Knox County, Tennessee.  He is a licensed Registered Nurse who

was recruited by ICP to work for NHC in Tennessee and worked for NHC from December 2022 to January 2023.

14.     Plaintiff Lizalynn Cabral is a citizen of the Philippines and permanent resident of the United States who resides in Williamson County, Tennessee.  She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Massachusetts and worked for NHC in Tennessee from August 2022 until November 2023.

15.     Plaintiff Joy Chua is a citizen of the Philippines and permanent resident of the United States who resides in Hamilton County, Tennessee.  She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Georgia and worked for NHC in Georgia from October 2022 until February 2024.

16.     Plaintiff Marie Jodel Montalvo is a citizen of the Philippines and permanent resident of the United States who resides in Minnesota.  She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from February 2023 until September 2023.

17.     Plaintiff Vincent Zaulda is a citizen of the Philippines and permanent resident of the United States who resides in Williamson County, Tennessee.  He is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from August 2022 to January 2024.

18.     All Plaintiffs are of Asian race and Filipino ethnicity.

19.     At all times before and during their employment with Defendants, all Plaintiffs were citizens of the Philippines and not United States citizens.

20.     Plaintiffs consent in writing to become party Plaintiffs in this action for claims under the FLSA. (*See* **Exhibit A**, Collective Action Consent Forms.)

21.     Defendant National Health Corporation (NHC) is a Tennessee for-profit, publicly traded corporation with its principal place of business located at 100 East Vine Street, Suite 1400, Murfreesboro, TN 37130.  It may be served through its registered agent: National Registered Agents, Inc., 300 Montvue Road, Knoxville, Tennessee 37919.  With the other Defendants, NHC participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.

22.     Defendant Jeffrey R. Smith is U.S. citizen and Tennessee resident.  He is the President and Treasurer of NHC.  Mr. Smith signed the illegal employment agreements with Plaintiffs.  With the other Defendants, Mr. Smith participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were within the scope of his office and employment, performed on behalf of NHC, authorized by NHC, and constituted a pattern of illegal activity that NHC knew or should have known was occurring.

23.     Defendant Maria Wong is a U.S. citizen and Tennessee resident.  She is NHC's Corporate Director of Workforce Development. With the other Defendants, Ms. Wong participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were within the scope of her office and employment, performed on behalf of NHC, authorized by NHC, and constituted a pattern of illegal activity that NHC knew or should have known was occurring.

5

24.     Defendant Infinity Care Partners, LLC (ICP) is a Tennessee limited liability company with its principal place of business located at 5016 Centennial Boulevard, Suite 200, Nashville, Tennessee 37209.  It may be served through its registered agent: Andrew Joseph Huckabay, 349 Raintree Drive, Hendersonville, Tennessee 37075.  ICP recruits nurses in the Philippines to work for NHC and other companies, including facilitating hiring, contracts, immigration, and travel.  With the other Defendants, ICP participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were performed on behalf of ICP, authorized by ICP, and constituted a pattern of illegal activity that ICP knew or should have known was occurring.

25.     Defendants John Does 1-10 are individuals and/or entities whose true names and identities have not yet been ascertained but who work for or on behalf of Defendants NHC and/or ICP in the illegal actions pled herein.  With the other Defendants, Does 1-10 participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were performed on behalf of NHC and/or ICP, authorized by NHC and/or ICP, and constituted a pattern of illegal activity that NHC and/or ICP knew or should have known was occurring. Once such defendants have been properly identified, Plaintiffs will add them to this action as party defendants.

26.     Defendants comprise a venture as that term is used in the TVPA, 18 U.S.C. §§ 1589 and 1595.

27.     Each Defendant is an individual or legal entity capable of holding a beneficial interest in property and therefore a "person" as that term is used in the RICO, 18 U.S.C. § 1961(3).

28.     Defendants are associated in fact, though not a legal entity and therefore are an enterprise ("RICO Enterprise I") as that term is used in RICO, 18 U.S.C. § 1961(4).

29.     Defendants NHC and ICP are associated in fact, though not a legal entity, and therefore are an enterprise ("RICO Enterprise II") as that term is used in the RICO, 18 U.S.C. § 1961(4).

30.     All Defendants were associated with RICO Enterprise I and/or RICO Enterprise II (collectively, "the RICO Enterprises").

31.     The RICO Enterprises are engaged in, or their activities affect, interstate or foreign commerce.

32.     Each Defendant was an "employer" of Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 203(d).

33.     Defendants are an enterprise engaged in commerce or in the production of goods for interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203(r) and (s) in that they have an annual gross volume of sales made or business done of not less than $500,000.

## IV.     FACTUAL ALLEGATIONS

### A.  The Defendants' Human Trafficking Scheme

34.     Defendants conducted or participated in RICO Enterprise I and/or RICO Enterprise II through the acts and omissions set forth in paragraphs 36-80, below, which constituted a pattern of racketeering.

35.     Alternatively, Defendant ICP conspired with Defendants Smith, Wong, Does 1-10, and NHC by adopting the goal of furthering and participating in the objectives of Defendants Smith, Wong, Does 1-10, and NHC to engage in acts and omissions set forth in paragraphs 36-80, below.

7

36.     Defendant NHC owns and operates over 150 residential medical facilities and home-health agencies in at least eight states, including nursing homes, assisted living facilities, hospice agencies, homecare agencies, and behavioral health hospitals, caring for thousands of patients each day.

37.     Many of NHC's facilities are located in rural areas in the Southeast where there may be a shortage of qualified medical professionals to care for patients.  Therefore, NHC takes advantage of immigration programs through which U.S. companies can hire skilled workers from overseas.

38.     Defendant ICP is a recruiting agency that recruits international nurses to work for U.S. healthcare companies in the United States, including NHC.  It also maintains offices in the Philippines.

39.     At all relevant times, NHC used ICP to recruit Filipino nurses to work at its U.S. facilities.  Together, they operated and continue to operate an illegal human trafficking scheme, as described in the following paragraphs.

40.     ICP recruited Plaintiffs and other Filipino nurses to apply for healthcare jobs in the United States by promising that the process is "free."

41.     ICP's Filipino office facilitated initial contact with NHC for Plaintiffs and other Filipino nurse candidates.

42.     When NHC decided to hire the Plaintiffs and other Filipino nurses, ICP and NHC presented them with two documents simultaneously: an Offer Letter and the ICP Immigration Services Agreement.

8

43.     The Offer Letter stated the location, rate of pay, shift, benefits, and duration of the Plaintiffs' and other Filipino nurses' employment with NHC.  The Offer Letter also stated that a "separate employment contract" with NHC would be sent to the nurses later.

44.     The ICP Immigration Services Agreement (the "ICP Agreement") set out the services provided by ICP to aid the Plaintiffs, other Filipino nurses, and their families with the immigration process. It stated that, in the event the nurse did not complete the process and accept the position set out in the Offer Letter, he or she would owe ICP $11,000 or more in fees, plus attorneys' fees and costs.  (*See* **Exhibit B**, Precioso ICP Agreement.)

45.     The Offer Letter instructed the Plaintiffs and other Filipino nurses to sign and return both the Offer Letter and the ICP Service Agreement within five days of receipt.

46.     ICP intended the Offer Letter and ICP Agreement to make the Plaintiffs and other Filipino nurses believe they were contractually obligated, under threat of financial harm and loss of immigration services, to continue the process.

47.     Only after the Plaintiffs and other Filipino nurses signed the Offer Letter and the ICP Agreement under these threats did ICP and NHC send the Plaintiffs and other Filipino nurses a copy of the NHC Nursing Employment Agreement (the "NHC Agreement"), signed by Defendant Jeffrey Smith.

48.     The NHC Agreement contained illegal, unconscionable, and coercive terms, including the following (*see* **Exhibit C**, Precioso NHC Agreement):

        a.      NHC, in its sole discretion and at any time, could reassign the nurse for a three-year period to a different NHC facility;

        b.      A complete ban on seeking employment with any person or entity other than NHC for at least three years (the "Noncompetition Penalty");

9

c. A termination clause that allowed NHC to terminate the contract at any time in its sole discretion but did not allow the nurse to terminate the contract *for any reason*; and

d. A one-way liquidated damages penalty of $40,000 if the nurse failed to complete his or her NHC assignment for *any reason*, in addition to a requirement that the nurse reimburse all NHC's costs and expenses, including attorneys' fees, for legal action to recover this amount, all due within 90 days of the demand (the "Liquidated Damages Penalty").

49. Because the Plaintiffs and other Filipino nurses had already signed the Offer Letter and ICP Agreement before they were presented with the NHC Agreement, Defendants intended to, and did, make the Plaintiffs and other Filipino nurses believe they have no choice but to sign it under threat of financial harm and loss of their immigration status.

50. Upon securing the NHC Agreement through these threats, NHC, with assistance from ICP, applied for permission from the U.S. Department of Labor to hire the Plaintiffs and other Filipino nurses as an employer sponsor.

51. NHC materially misrepresented the terms and condition of Plaintiffs' and other Filipino nurses' employment on the applications with the U.S. Department of Labor by underreporting Plaintiffs' and other Filipino nurses' education and experience, the positions Plaintiffs and other Filipino nurses would fill, and/or the NHC locations where Plaintiffs and other Filipino nurses would work.

52. Because the Liquidated Damages Penalty is illegal under Filipino law, NHC and ICP presented letters to the U.S. Consulate that did not accurately reflect the true terms of the Plaintiffs' and other Filipino nurses' contracts with NHC in order to ensure their applications were

10

approved. Plaintiffs and other Filipino nurses were also coached by Defendants on what they should say during their Consulate interviews to ensure these misrepresentations were not discovered.

53. Once the government approved Plaintiffs' and other Filipino workers' immigration and the visas were secured, ICP, acting on behalf of NHC, arranged for transportation to the United States.

54. Commonly, and sometimes a few days or even hours before their travel, NHC reassigned nurses to facilities other than those specified in their original contracts and applications for foreign labor certification submitted to the U.S. Department of Labor.

55. The escalating liquidated damages provisions in the ICP Agreement and the subsequent NHC Agreement, the "bait and switch" misrepresentations about the terms and conditions of employment, and the illegal terms in the ICP Agreement and NHC Agreement constituted an intentional abuse of legal process—Plaintiffs' and other Filipino nurses' entry into the United States with U.S. government work authorization—through which Defendants provided and obtained Plaintiffs' and other Filipino nurses' labor.

56. NHC and ICP often placed the Filipino nurses at jobs in rural areas where they were isolated and without easy access to travel, services, and other resources.

57. When the Plaintiffs and other Filipino nurses began work, NHC did not provide proper training, staffing, equipment, and other resources needed for them to do their jobs safely and professionally. Plaintiffs and other Filipino nurses were often subjected to discriminatory, illegal, and dangerous conditions that threatened their own and their patients' safety and health.

58. Defendants did not pay Plaintiffs and other Filipino nurses the required prevailing wage corresponding to the skill level of the work the Plaintiffs were required to perform.

11

59.     When, in order to protect their licenses, careers, and patients, the Plaintiffs and other Filipino nurses felt compelled to resign from their employment with NHC, NHC (often through Defendant Maria Wong) and ICP would threaten, coerce, and intimidate them to try to force them to return to work by threatening financial harm or legal action under the NHC Agreement and ICP Agreement.

60.     These tactics included, but were not limited to, false imprisonment, threatening and harassing calls, emails, and text messages, debt collectors, attorney demand letters, and filing of civil lawsuits.

61.     These interactions included explicit and implied threats that the Plaintiffs' and other Filipino nurses' or their family's immigration status could be revoked, that they would be sued, and that they owed tens of thousands of dollars that must be paid within 90 days or less unless they remained employed by NHC under the terms of their illegal contracts.  Some examples of these tactics included, but were not limited to, the following:

     a.     When Plaintiff Marie Jodel Montalvo resigned from her employment at NHC Pulaski in September 2023 because of unsafe working conditions for her and the residents at the facility, Defendants caused her to be falsely imprisoned in the office of the facility administrator (who, upon information and belief, is the son of Defendant Maria Wong) and told she could not leave the room until she signed a letter agreeing that she owed NHC $33,333.33.  She was only allowed to leave when she called an attorney who threatened to call 911 if Ms. Montalvo was not released.

     b.     Despite the NHC Agreement's provision stating that she had 90 days to pay this amount, less than one month later, on October 3, 2023, Defendants caused Defendant NHC to file a lawsuit against Plaintiff Marie Jodel Montalvo to enforce the $40,000

liquidated damages penalty in NHC's contract (M.D. Tenn. Case No. 1:23-cv-00074). The lawsuit also seeks damages for unjust enrichment, attorneys' fees, costs, interest, and equitable relief.

c.      After Plaintiff Vincent Zaulda provided NHC with 30 days' notice of his intent to resign from his employment, NHC required that he meet with his facility administrator so NHC could demand the money NHC claimed he owed. When Mr. Zaulda refused to attend this meeting because he feared for his safety, Defendants caused NHC to refuse to schedule Mr. Zaulda to work until he did. Despite giving the 30 days' notice required under NHC's policies to be paid out his earned vacation and sick pay, NHC refused to pay these benefits, in violation of Tennessee law, because it claimed Mr. Zaulda owed money under the Liquidated Damages Penalty. These actions resulted in Mr. Zaulda losing wages and benefits to which he was entitled under his contract and NHC's policies. Mr. Zaula resigned from his employment in December 2023, after sixteen months of work, due to unsafe working and patient conditions and lack of proper training.

d.      On October 13, 2023, the Defendants caused Defendant NHC to send an attorney demand/debt collection letter to Plaintiff Nerissa Precioso claiming she owed NHC $44,906.66 in penalties, including over $12,000 in attorneys' fees and costs for the demand letter. The letter threatened to sue Ms. Precioso unless she paid the amount in full within 90 days. Ms. Precioso was forced to resign in April 2023 after seven months of work due to unsafe working and patient conditions and being forced to perform supervisor-level job duties without proper training or compensation and in violation of her contract.

e.      On April 9, 2024, Defendants caused Defendants NHC and Maria Wong to send demand/debt collection letters to several Filipino nurses, including Plaintiffs Lizalynn

Cabral, Jan Vincent Austria, and Vincent Zaulda, claiming they owed NHC under the Liquidated Damages Penalty. The letter threatened legal action against Ms. Cabral, Mr. Austria, Mr. Zaulda, and the other Filipino nurses who received the letters unless they responded within 30 days and paid the full amount demanded within 90 days. The amounts demanded from Plaintiffs ranged from $18,000 to $37,333.33 and, in at least two cases, were different than the amounts originally demanded by NHC upon Plaintiffs' discharges. Ms. Cabral, Mr. Austria, and Mr. Zaulda were each forced to resign due to unsafe working and patient conditions, unfair and discriminatory wages, and/or lack of proper training.

62.     By using these threatening tactics and financial and legal penalties, the Defendants have engaged in a deliberate scheme, pattern, and plan intended to cause Plaintiffs and other Filipino nurses to believe that they would suffer serious harm and physical restraint if they tried to leave Defendants' employ and find other employment.

63.     The Plaintiffs and other Filipino nurses were aware of these and other retaliatory and discriminatory actions the Defendants took or threatened to take. Therefore, the Plaintiffs and other Filipino nurses reasonably believed they would suffer similar serious harm or physical restraint if they left or tried to leave.

64.     The Defendants' detention of Plaintiff Marie Jodel Montalvo was physical restraint Defendants intended would obtain Ms. Montalvo's continuing labor and cause the other nurses to believe they would suffer physical restraint if they did not continue to work for the Defendants.

65.     The Defendants' standard employment agreement term, the Liquidated Damages Penalty, was intended to cause the Plaintiffs and other Filipino nurses to believe that they will suffer serious financial harm and abuse of legal process if they tried to leave Defendants' employ

14

and find other employment. Defendant Maria Wong explicitly told other nurses that NHC was suing Ms. Montalvo to "make an example" of her for other Filipino nurses.

66. The Liquidated Damages Penalty was arbitrary and disproportionate to the actual costs incurred by Defendants.

67. The Liquidated Damages Penalty was disproportionate to the compensation paid to Plaintiffs and the other Filipino nurses.

68. Likewise, Defendants intended the Noncompetition Penalty (which was enforced through the Liquidated Damages Penalty) to cause the Plaintiffs and other Filipino nurses to believe that they would suffer serious harm, including financial harm, and abuse of legal process if they left their employment with Defendants to work for another company as a nurse.

69. The Defendants' use of actual and threatened legal action was a deliberate scheme, pattern, and plan intended to send a message to the Plaintiffs and other Filipino nurses that they would face civil litigation and incur substantial financial harm—including the $40,000 penalty and Defendants' fees and costs under the Liquidated Damages Penalty and the inability to find other work under the Noncompetition Penalty—if they stop working for Defendants.

70. The Defendants' use of actual and threatened legal action constitutes the use of a law or legal process for a purpose for which the law was not designed, in order to exert pressure on the Plaintiffs and other Filipino nurses to continue working for NHC under discriminatory, illegal, and dangerous conditions and to prevent them from leaving their employment with NHC.

71. Likewise, the Defendants' misuse of the U.S. Department of Labor foreign labor certification process, including by misrepresenting the terms and conditions Plaintiffs' and other Filipino nurses' employments, constitutes the use of a law or legal process for a purpose for which the law was not designed, in order to exert pressure on the Plaintiffs and other Filipino nurses to

15

begin and continue working for NHC under discriminatory, illegal, and dangerous conditions and to prevent them from leaving their employment with NHC.

72. Based on these threats and actions, Plaintiffs and other similarly situated Filipino nurses reasonably feared serious financial, professional, reputational, and psychological harm if they did not continue working for Defendants, despite the conditions under which they are forced to work.

73. Through this illegal trafficking scheme, NHC and ICP maintained and continue to maintain the forced labor of the nurses.

74. Defendants recruited Plaintiffs and other Filipino nurses and transported them to and withing the United States for the purpose of forced labor, thereby trafficking the Plaintiffs and other Filipino nurses for forced labor. Sometimes, Plaintiffs and other Filipino nurses did not know where in the U.S. they were going until shortly—sometimes only hours—before they left the Philippines.

75. Defendants knowingly benefited financially from participating in the venture with each other and which Defendants knew or should have known, *inter alia*:

a. Provided and obtained Plaintiffs' and other Filipino nurses' labor through misrepresentations about the terms and conditions of employment in the process of securing their entry into and employment in the United States;

b. Provided and obtained Plaintiffs' and other Filipino nurses' labor by threatening and bringing litigation to enforce the illegal Liquidated Damages Penalty and additionally seeking attorneys' fees and costs associated with that actual or threatened litigation;

16

c.       Provided and obtained Plaintiffs' and other Filipino nurses' labor by means of a scheme, plan, or pattern intended to cause the nurses to believe that, if they did not continue working for Defendants, they would be unable to work for any other person or entity for a period of at least three years; and

d.       Provided and obtained Plaintiffs' and other Filipino nurses' labor by means of a scheme, plan, or pattern intended to cause the nurses to believe that, if they did not continue working for Defendants, they would suffer financial, legal, personal, professional, psychological, and reputational harm or physical restraint.

76.     Defendants did not subject non-Asian, non-Filipino, and/or U.S. citizen employees to forced labor, trafficking for forced labor, or illegal contracts. Only Plaintiffs and other Filipino nurses were subject to the ICP Agreement and NHC Agreement.

77.     Defendants and Defendants' non-Filipino employees were aware of the forced labor and trafficking for forced labor of the Plaintiffs and other Filipino nurses and knew that they were not free to leave their employment with NHC. This caused Defendants and Defendants' non-Filipino managers and other employees to intentionally discriminate against Plaintiffs and other Filipino nurses based on their race, ethnicity, and citizenship, through actions including but not limited to the following:

a.       Assigning Plaintiffs and other Filipino nurses to undesirable positions, duties, shifts, and/or hours;

b.       Refusing to provide aid to Plaintiffs and other Filipino nurses;

c.       Issuing reprimands and discipline to Plaintiffs and other Filipino nurses that were disproportionately harsh and different than the corrections offered to non-Asian, non-Filipino, and/or U.S. citizen employees for similar conduct;

d.      Refusing to pay Plaintiffs and other Filipino nurses in accordance with their contracts, skill levels, positions, and/or duties; and

e.      Retaliating against Plaintiffs and other Filipino nurses if they opposed this discrimination.

78.     Defendants' illegal trafficking scheme was applied only to Plaintiffs and other similarly situated Filipino nurses. Defendants did not subject non-Asian, non-Filipino, and/or U.S. citizen workers to the same treatment.

79.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other similarly situated Filipino nurses have suffered financial and economic harm.

80.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other similarly situated Filipino nurses have suffered adverse consequences to their physical, emotional, and/or mental health; stress, anxiety, anguish, embarrassment, humiliation, inconvenience, loss of enjoyment of life, reputational and/or professional harm; and have incurred attorneys' fees, costs, and litigation expenses.

### B.    Class Action Claims

81.     Defendants' conduct described above was part of and resulted from policies and practices that the defendants applied to all Filipino nurses they recruited and employed. Plaintiffs therefore bring the claims alleged herein as a class action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

82.     The class is comprised of all nurses who were recruited by the Defendants from the Philippines and began employment with NHC within the United States on or after May 6, 2014 (the "Nationwide Class").

83.     In the alternative, subclasses are comprised of:

18

a.        **Subclass 1:** All nurses who were recruited by Defendants from the Philippines and began employment with NHC within Tennessee on or after May 6, 2014 (the "Tennessee Subclass").

b.        **Subclass 2:** All nurses who were recruited by Defendants from the Philippines and began employment with NHC within Georgia on or after May 6, 2014 (the "Georgia Subclass").

84.        The term "Classes" as set forth in this Complaint shall refer to the Nationwide Class or, in the alternative, the Tennessee Subclass and the Georgia Subclass.

85.        Plaintiffs reserve the right to amend the definitions of the Classes based on discovery or legal developments, as appropriate.

86.        Plaintiffs are members of the Classes they seek to represent.

87.        Plaintiffs do not know the exact number of members of the Classes, but the number of members of the Classes is greater than can be feasibly addressed through joinder. Upon information and belief, NHC currently has more than ten thousand employees. Based on Plaintiffs' experiences, NHC employs at least 3-5 Filipino nurses in each of its facilities. Therefore, Plaintiffs believe that NHC employs at least several hundred Filipino nurses over its more than 150 facilities, including more than 40 nurses in Tennessee and Georgia, respectively.

88.        There are questions of law and fact common to Plaintiffs and the Classes that predominate over any questions affecting only individual members of the class. These common questions of law and fact include, but are not limited to, the following:

a.        Whether Defendants engaged in a policy and practice of failing to pay Filipino nurses the prevailing wage corresponding to the work they performed;

19

b. Whether Defendants engaged in a policy and practice of employing Filipino nurses in positions not commensurate with those for which they were paid and hired;

c. Whether Defendants engaged in a policy and practice of employing Filipino nurses under unsafe working and patient conditions;

d. Whether Defendants engaged in a policy and practice of intentionally engaging in and/or allowing discrimination against Filipino nurses on the basis of race, ethnicity, and/or citizenship;

e. Whether Defendants engaged in a policy and practice of requiring Filipino nurses to sign the Liquidated Damages Penalty, in violation of applicable law;

f. Whether Defendants engaged in a policy and practice of using the unenforceable Liquidated Damages Penalty to coerce Filipino nurses to continue working for them;

g. Whether Defendants engaged in a policy and practice of using the unenforceable Noncompetition Penalty to coerce Filipino nurses to continue working for them;

h. Whether the Defendants engaged in a policy and practice of using misrepresentation and fraud to hide their illegal agreements from the U.S. and Filipino governments;

i. Whether the Defendants are a "venture" within the meaning of the TVPA;

j. Whether Defendants are an "enterprise" within the meaning of the RICO;

k. Whether Defendants NHC and ICP are an "enterprise" within the meaning of the RICO;

l.      Whether Defendants engaged in a policy and practice of using threats of financial harm to coerce Filipino nurses to continue working for them;

m.      Whether Defendants engaged in a policy and practice of actual and threatened legal process to coerce Filipino nurses to continue working for them;

n.      Whether the Defendants should be enjoined from using, enforcing, or threatening to enforce the NHC Agreement;

o.      Whether the Classes can be made whole by the payment of damages; and

p.      Whether Defendants are liable to the Classes.

89.      Plaintiffs' claims are typical of the Classes.  Plaintiffs and all members of the Classes have sustained injuries and damages arising out of and proximately caused by Defendants' policies, practices, plan, and scheme of not paying the prevailing wage, engaging in discrimination based on their race and ethnicity, and using (and deliberately not disclosing to the Filipino government) the unenforceable Liquidated Damages Penalty, Noncompetition Penalty, and threats of legal process and financial harm to intimidate them.

90.      Plaintiffs will fairly and adequately represent the interests of the members of the Classes.  Plaintiffs' counsel is competent and experienced in litigating complex employment and labor trafficking class actions.

91.      A class action is superior to other available means for fair and efficient adjudication of this controversy.  Each member of the Classes has been damaged and is entitled to recovery because Defendants' illegal policies, practices, scheme, and plans applied generally and equally to all members of the Classes. Individual joinder of all members of the Classes is not practicable, and questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.   Class action treatment will allow those similarly situated

persons to litigation their claims in the manner that is most efficient and economical for the parties and the judicial system. Upon information and belief, Defendants have electronic records and data that will make identification of specific members of the Classes relatively simple. The propriety and amount of punitive damages and declaratory, injunctive, or other equitable relief is based on Defendants' intentional and continuous conduct, which is common to the Classes.

### C.      Wage Claims

92.      NHC provided the Plaintiffs and other similarly situated Filipino nurses with a "housing stipend" to pay for housing during their first month of employment.

93.      NHC customarily provided this "housing stipend" as an addition to the wages they paid to the Plaintiffs and other similarly situated Filipino nurses.

94.      In calculating overtime premiums, NHC did not include the "housing stipend" as part of the Plaintiffs' and other Filipino nurses' regular rate of pay.

95.      NHC paid Plaintiffs and other similarly situated Filipino nurses a "shift differential" bonus for working less desirable shifts.

96.      In calculating overtime premiums, NHC did not include this "shift differential" as part of the Plaintiffs' and other Filipino nurses' regular rate of pay.

97.      Therefore, NHC did not pay overtime premiums at a rate one-and-a-half the regular rate of pay, including the housing stipend and shift differential.

98.      NHC required Plaintiffs and other Filipino nurses to perform work that required a higher skill level than what corresponded to the required prevailing wage NHC paid. NHC did not base its calculation of overtime premiums on this higher required regular rate of pay.

99.      Therefore, NHC did not pay overtime premiums at a rate of one-and-a-half the regular rate of pay.

## D. FLSA Claims on Behalf of Similarly Situated Nurses

100.   Plaintiffs bring their FLSA claims on behalf of themselves and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required overtime wages at Defendants' operations during the three-year period preceding the filing of this lawsuit.

101.   The FLSA collective is comprised of all nurses who were recruited by the Defendants from the Philippines and were employed with NHC within the United States at any time on or after May 6, 2021 (the "Class").

102.   There is a strong likelihood the Plaintiffs and other Filipino nurses were subject to the same policies and practices of Defendants with respect to underpayment of overtime at the rate of one-and-a-half times the regular rate of pay, including the housing stipend, the shift differential, and the appropriate prevailing wage.

103.   Therefore, there is a strong likelihood that other Filipino nurses subject to the same policies and practices of Defendants are similarly situated to the Plaintiffs.

104.   Common proof applicable to Plaintiffs and other Filipino nurses in FLSA collective will show that the Defendants failed to properly pay them overtime wages as required by the FLSA.

105.   Plaintiffs believe that there are hundreds of other similarly situated workers who suffered from Defendants' FLSA violations (*see* ¶ 87, *supra*).  Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA collective, but this information is readily ascertainable from the Defendants' records.

106.    Through this lawsuit, Defendants are informed of the Plaintiffs' FLSA claims therefore "may glean the 'generic identities' of the [prospective FLSA plaintiffs] and the "subject matter and size" of the litigation."[1]

107.    The FLSA statute of limitations should be equitably tolled for all similarly situated Filipino nurses from the date this lawsuit was filed until the Court determines there is a strong likelihood the Plaintiffs and other Filipino nurses are similarly situated.

108.    The Defendants therefore should be required to provide Plaintiffs with a list— including last known addresses, telephone numbers, email addresses, and messaging (such as WhatsApp) contact information, if known—of all similarly situated Filipino nurses.

109.    Plaintiffs should be permitted to distribute Court-authorized notice of the FLSA action to all Filipino nurses the Court determines are similarly situated to the Plaintiffs.

## V.    CAUSES OF ACTION

### COUNT I
**Trafficking Victims Protection Act**
**(Class Claim)**

110.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

111.    This cause of action sets for Plaintiffs' and other Filipino nurses' claims against Defendants under the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, in that:

a.    Plaintiffs and other Filipino nurses are victims of violations of the following

provisions of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589 (forced

---

[1]    *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1014 (6th Cir. 2023) (Bush, J., concurring) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)).

24

labor) and 1590 (trafficking for forced labor);

      b.      Defendants were perpetrators of the foregoing violations; and

      c.      Defendants knowingly benefited financially from participation in a venture they knew or should have known engaged in the foregoing violations. *See* 18 U.S.C. § 1595(a).

112.     In violation of 18 U.S.C. § 1589, Defendants knowingly provided and obtained Plaintiffs' and other Filipino nurses' labor or services by means of:

      a.      Physical restraint and/or threats of physical restraint;

      b.      Serious harm and/or threats of serious harm;

      c.      Abuse of legal process and threats of abuse of legal process; and/or

      d.      A scheme, plan, or pattern intended to cause Plaintiffs and other Filipino nurses to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint.

113.     In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants, directly or through their agents, knowingly recruited, transported, provided, and obtained Plaintiffs and other Filipino nurses for labor or services in furtherance of the Defendants' violations of 18 U.S.C. § 1589.

114.     Alternatively, in violation of 18 U.S.C. § 1594(a), Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590.

115.     Alternatively, in violation of 18 U.S.C. § 1594(b), some Defendants violated 18 U.S.C. §§ 1589 and 1590 and some Defendants conspired to violate 18 U.S.C. §§ 1589 and 1590.

116.     Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of

conscious indifference to the consequences.

117. Under the TVPA, Plaintiffs and other Filipino nurses are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including but not limited to:

      a.     compensation at the promised wage rate including all applicable overtime wages for the work done while employed by Defendants;

      b.     compensation for all additional pecuniary losses proximately caused by Defendants' violations of the TVPA;

      c.     other compensatory damages, including compensation for physical and emotional injuries;

      d.     punitive damages; and

      e.     attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

## COUNT II
### Tennessee Human Trafficking Act
### (Class Claim)

118. Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

119. This cause of action sets for Plaintiffs' and other Filipino nurses' claims against Defendants under the civil remedies provision of the Tennessee Human Trafficking Act ("THTA"), Tenn. Code Ann. § 39-13-314, in that:

      a.     Plaintiffs and other Filipino nurses are a victim of violations of the following provisions the THTA: Tenn. Code Ann. § 39-13-307 (involuntary labor servitude) and § 39-13-308 (trafficking persons for forced labor or services);

      b.     Defendants were perpetrators of the foregoing violations; and

26

c.     Defendants committed, commenced, and/or consummated their offenses against Plaintiffs and other Filipino nurses under the THTA in Davidson County and/or Rutherford County, in the State of Tennessee.  *See* Tenn. Code Ann. § 39-11-103.

120.    In violation of Tenn. Code Ann. § 39-13-307, Defendants knowingly subjected or attempted to subject Plaintiffs and other Filipino nurses to forced labor by means of:

a.     Physical restraint and/or threats of physical restraint;

b.     Abuse of legal process and threats of abuse of legal process; and

c.     Using or threatening to cause financial harm and/or extortion for the purpose of exercising financial control over the Plaintiffs and other Filipino nurses.

121.    In violation of Tenn. Code Ann. § 39-13-308, and in addition to the violations of Tenn. Code Ann. § 39-13-307 set forth above, Defendants knowingly:

a.     Recruited, enticed transported, provided, and obtained—or attempted to do so—Plaintiffs and other Filipino nurses intending or knowing the Plaintiffs and other Filipino nurses would be subjected to involuntary labor services;

b.     Benefitted, financially or by receiving anything of value, from participation in a venture that has engaged in violations of the prohibition against involuntary labor or services; and

c.     Agents of the corporate defendants NHC And ICP (including but not limited to Defendants Smith, Wong, and/or Does 1-10) performed the conduct that is an element of § 308 while acting within the scope of agent's office or employment and on behalf of the corporate defendants, and the commission of the conduct was authorized, requested, commanded, performed, and/or within the scope of the agent's employment on behalf of the corporation or constituted a pattern of illegal activity that an agent of the corporations

27

knew or should have known was occurring. *See* Tenn. Code Ann. § 39-13-311.

122.    Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

123.    Under the THTA, Plaintiffs and other Filipino nurses are entitled to recover damages in an amount to be proven at trial, including but not limited to:

    a.    Medical expenses, including psychological treatment;

    b.    Costs of necessary housing, transportation, and child care;

    c.    The greater of: (1) compensation at the promised wage rate including all applicable overtime wages for the work done while employed by Defendants; or (2) the gross income or value to Defendants of Plaintiffs' and other Filipino nurses' labor or services while in the human trafficking situation;

    d.    compensation for any and all additional losses proximately caused by Defendants' violations of the THTA;

    e.    other compensatory damages, including compensation for physical and emotional distress, pain, and suffering;

    f.    punitive damages; and

    g.    attorneys' and experts' fees and costs.

124.    Plaintiffs also are entitled to an injunction prohibiting Defendants from engaging in further violations of the THTA.

<u>**COUNT III**</u>
**Racketeer Influenced and Corrupt Organizations Act**
**(Class Claim)**

125.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set

28

forth fully here.

126. This Count sets forth claims by Plaintiffs and other Filipino nurses against all Defendants for damages resulting from Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68.

127. Each Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

128. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

129. The RICO Enterprises, as defined above (at paragraphs 28 and 29), are association-in-fact enterprises with the common purpose of securing a captive workforce of nurses for employment at facilities throughout the United States and to profit the nurses' labor.

130. The RICO Enterprises engaged in and affected interstate commerce.

131. The RICO Enterprises function as continuing units.

132. The Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprises, through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

133. Each of the Defendants also participated in the operation or management of the respective enterprise itself, directing the activity of the enterprise.

134. Specifically, the Defendants conducted or participated and/or conspired to do so in the affairs of the respective RICO Enterprises by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

a. Labor trafficking, in violation of 18 U.S.C. §§ 1589 and 1590;

b. Extortion, in violation of Tenn. Code Ann. § 39-14-112.

29

### *Predicate Acts*

#### TVPA Violations: 18 U.S.C. §§ 1589, 1590, and 1595

135.     As set forth in paragraphs 34-80, *supra*, the Defendants, through the RICO Enterprises, knowingly provided and obtained Plaintiffs' and other Filipino nurses' labor or services, and subjected them to forced labor in violation of 18 U.S.C. § 1589; recruited, transported, provided, and obtained Plaintiffs' and other members of the Classes for the purpose of forced labor in violation of 18 U.S.C. § 159; and knowingly benefited financially from participation in a venture it  knew or should have known was engaged in forced labor and trafficking for forced labor, as set forth in 18 U.S.C. § 1595.

#### Extortion: Tenn. Code Ann. § 39-14-112

136.     Defendants, through the RICO Enterprises, used coercion with the intent to obtain Plaintiffs' and other Filipino nurses' services, to gain financial advantage, and to restrict Plaintiffs' and other Filipino nurses' freedom of action and free exercise or enjoyment of their rights and privileges under the U.S. and Tennessee Constitutions and laws of Tennessee, including the freedom to seek other employment.

137.     Specifically, the Defendants used physical restraint and threatened physical restraint, and the actual and threatened enforcement of the Liquidated Damages Penalty, Noncompetition Penalty, and other associated fees with the intent to make the Plaintiffs fear coercive retribution of they left their employment with Defendants and started to work elsewhere.

### *Pattern of Related Racketeering Acts*

138.     Defendants, through the RICO Enterprises, engaged in the racketeering activity described in this claim repeatedly throughout the entire period of their association-in-fact, which, upon information and belief, began in 2019 and continues until the present.

139.     The pattern affected hundreds of individuals, accomplishing its purposes on dozens of occasions during the period of the pattern of racketeering acts.

140.     Defendants, through the RICO Enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

141.     Defendants, through the RICO Enterprises, continue to engage in the racketeering acts and threaten to repeat and extend the racketeering acts indefinitely into the future.

142.     Defendants' racketeering acts have or had similar purposes: to profit from the Plaintiffs' and other Filipino nurses' coerced labor.

143.     Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiffs and other  members of the Classes, including underpayment of wages, lost employment opportunities, legal fees and costs, and other out-of-pocket costs.

144.     As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Defendants and their agents.

145.     As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, directed their racketeering activities at similar individuals and entities: Plaintiffs and other Filipino nurses.

146.     The Defendants' acts have or had similar methods of commission, such as common recruitment tactics and use of similar employment practices and policies with respect to Plaintiffs and other Filipino nurses.

### *Conspiracy*

147.     As set forth in paragraphs 34-80, *supra*, Defendants conspired to violate the RICO, by agreeing to participate in the objectives of the Enterprises to engage in the pattern of racketeering activity.

31

148.    As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs and Filipino nurses have suffered injuries to their property, including but not limited to transportation costs in the Philippines, unreimbursed housing and transportation costs in the United States, incidental relocation expenses, wage underpayments, lost employment opportunities, legal fees and costs associated with Defendants' liquidated damages enforcement actions, the actual payment of some or all the liquidated damages, and/or other pecuniary losses.

149.    Plaintiffs and other  members of the Classes are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

a.    compensation for their injuries to their property;

b.    trebling of the damages set forth in subparagraph (a), *supra*; and

c.    attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

150.    Plaintiffs are entitled to recover their reasonable attorney's fees and costs of litigation.

## Count IV
## Civil Rights Act of 1866
## (Class Claim)

151.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

152.    This cause of action sets for Plaintiffs' and other Filipino nurses' claims against Defendants under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), in that:

a.    Defendants discriminated in the making and enforcement of contracts,

32

including the making, performance, modification, and termination of the contractual relationship between Defendants and Plaintiffs and other Filipino nurses, based on race, ethnicity, and citizenship;

b.    Defendants retaliated against Plaintiffs and other Filipino nurses for opposing such discrimination and/or participating in activity opposing discrimination;

c.    Defendants are vicariously liable for the actions of their managers as well as directly liable for their own discriminatory actions; and

d.    Defendants violations were intentional, malicious, and/or done with reckless indifference to Plaintiffs' and other Filipino nurses' federally protected rights.

153.    Under Section 1981, Plaintiffs and other Filipino nurses are entitled to recover damages in an amount to be proven at trial, including but not limited to:

a.    Compensation for all pecuniary losses proximately caused by Defendants' violations;

b.    other compensatory damages, including compensation for physical and emotional distress, pain, and suffering;

c.    punitive damages; and

d.    attorneys' and experts' fees and costs.

**<u>Count V</u>**
**Fair Labor Standards Act**
**(FLSA Overtime)**
**(Plaintiffs and Similarly Situated Filipino Nurses)**

154.    By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

155. This count sets forth a claim by Plaintiffs, and by all similarly situated workers who opt into this action pursuant to 29 U.S.C. § 216(b), for damages resulting from Defendants' violations of the FLSA overtime requirements, 29 U.S.C. § 207.

156. At all relevant times Defendants jointly employed Plaintiffs and all similarly situated workers at their facilities throughout the United States.

157. Defendants were Plaintiffs' and all similarly situated workers' employers under the FLSA.

158. Plaintiffs and all similarly situated workers were at all times nonexempt workers whose employment was subject to the minimum wage, overtime, and recordkeeping requirements of the FLSA.

159. The Plaintiffs and the other similarly situated workers regularly worked more than forty hours in a single work week.

160. Defendants failed to pay Plaintiffs and other similarly situated workers overtime premiums at the rate of one-and-a-half times their regular rate of pay for every hour they worked above forty in a work week.

161. Defendants' failure to pay an overtime premium based on their employees' regular rate of pay for hours above forty in a work week violated the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

162. Defendants failed to maintain and preserve payroll records and other records documenting required information and data regarding Plaintiffs and other similarly situated workers, including but not limited to by failing to keep accurate records of the Plaintiffs' and other similarly situated employees' regular rate of pay.

34

163. Defendants' failure to maintain and preserve accurate records violated the FLSA and its implementing regulations, 29 C.F.R. § 516.

164. Defendants' violations of the overtime provisions of the FLSA were willful.

165. The Plaintiffs and the other similarly situated workers are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendants' unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

166. Plaintiffs and other similarly situated workers are also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

167. Plaintiffs and the other similarly situated workers also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

## VI.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order:

a.   assuming jurisdiction over this action;

b.   certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

c.   declaring there is a strong likelihood that other Filipino nurses subject to the same policies and practices of Defendants with respect to underpayment of overtime at the rate of one-and-a-half times the regular rate of pay, including the housing stipend, the shift differential, and prevailing wage, are similarly situated to the Plaintiffs;

35

d. ordering Defendants to provide contact information for all similarly situated Filipino nurses, authorizing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible workers who choose to do so to opt-in to the FLSA claims in this action;

e. declaring that the statute of limitations should be equitably tolled for similarly situated Filipino nurses who opt into the FLSA claims in this action, from the date this lawsuit was filed until the Court authorizes notice;

f. declaring that Defendants violated the TVPA;

g. declaring that Defendants violated the THTA;

h. declaring that Defendants violated the RICO;

i. declaring the Defendants violated Section 1981;

j. declaring that Defendants violated the FLSA overtime provisions;

k. permanently enjoining Defendants from further violations of the THTA and the FLSA;

l. granting judgment to Plaintiffs and other members of the Classes on their TVPA claims and awarding them compensatory and punitive damages;

m. granting judgment to Plaintiffs and other members of the Classes on their THTA claims and awarding them compensatory damages, the greater of their wage underpayments or the gross income or value to Defendants of Plaintiffs' and other Filipino nurses' labor or services, and punitive damages;

n. granting judgment to Plaintiffs and other members of the Classes on their RICO claims and awarding them actual damages, trebling of these damages, and interest;

36

o.  granting judgment to Plaintiffs and other members of the Classes on their Section 1981 claims and awarding them actual damages, punitive damages, compensatory damages, and interest;

p.  granting judgment to Plaintiffs and other similarly situated workers who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

q.  Awarding Plaintiffs and other Filipino nurses their costs and reasonable attorneys' fees; and

r.  Granting such further relief as the Court finds just.

Respectfully submitted,

*s/ Caraline E. Rickard*
RICKARD MASKER, PLC
Caraline E. Rickard (TN Bar No. 034414)
Curt M. Masker (TN Bar No. 037594)
810 Dominican Drive, Suite 314
Nashville, Tennessee 37228
Telephone: (615) 200-8389
Facsimile: (615) 821-0632
caraline@maskerfirm.com
curt@maskerfirm.com

RADFORD SCOTT, LLP
Daniel Werner* (GA Bar No. 422070)
Justin M. Scott* (GA Bar No. 974300)
315 W. Ponce de Leon Ave., Suite 1080
Decatur, Georgia 30030
(678) 271-0300
dwerner@radfordscott.com
jscott@radfordscott.com
*Pro hac vice application submitted contemporaneously herewith*

*Attorneys for Plaintiffs and the Proposed Class*

37