IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **NERISSA PRECIOSO, JAN VINCENT AUSTRIA, PATRICK BORJA, LIZALYNN CABRAL, JOY CHUA, MARIE JODEL MONTALVO, and VINCENT ZAULDA, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) ) | **Case No. 3:24-cv-561** <br><br> **District Judge Richardson** <br> **Magistrate Judge Holmes** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **NATIONAL HEALTH CORPORATION, JEFFREY R. SMITH, and MARIA WONG; INFINITY CARE PARTNERS, LLC; and JOHN DOES 1-10,** | ) ) ) ) ) | **CLASS ACTION** <br><br> **JURY DEMAND** |
| **Defendants.** | ) ) | |

**FIRST AMENDED CLASS ACTION AND COLLECTIVE ACTION COMPLAINT**

Plaintiffs, on behalf of themselves and all others similarly situated, allege as follows:

## I.     INTRODUCTION

1.      This is an action for damages, injunctive relief, declaratory relief, and other remedies for violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589 *et seq.*; the Tennessee Human Trafficking Act (THTA), Tenn. Code Ann. § 39-13-314; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Section 1981); the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*; breach of contract; and other federal and state law.

2.      Defendants National Health Corporation (NHC) and Infinity Care Partners, LLC (ICP) are Tennessee companies—one a national nursing home company and the other a foreign

1

labor recruiter—who together have recruited hundreds of nurses in the Philippines to work at NHC facilities throughout the United States.

3.     Together, they have built multi-million-dollar businesses on the backs of the indentured servitude of these foreign nurses, who are lied to, underpaid, and forced to work in unsafe conditions, putting their careers, their professions, and their patients' health and safety in jeopardy.

4.     To keep the nurses from leaving, Defendants have commenced or threatened baseless legal action, changes to immigration status, and serious financial harm if these nurses stop working for Defendants.

5.     They do this in part through illegal contracts that offer no way for the nurses to leave their employment and demand upwards of $40,000—often more than these nurses' net annual pay—should the nurses stop working for Defendants for any reason.

6.     Therefore, Plaintiffs bring this Complaint, on behalf of themselves and all other similarly situated individuals, seeking an injunction prohibiting Defendants from threatening to enforce or enforcing financial or other harms against Plaintiffs and all similarly situated individuals; a declaration that the illegal contracts used by Defendants are in violation of state and federal law; actual, compensatory, and punitive damages; an award of reasonable attorneys' fees and costs; and such other relief as the Court deems just and proper.

## II.     JURISDICTION & VENUE

7.     This Court has original subject matter jurisdiction over TVPA, RICO, and Section 1981 claims pursuant to 28 U.S.C. § 1331, because they arise under the Constitution and laws of the United States.

8.    This Court has supplemental jurisdiction over THTA and the other state law claims pursuant to 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

9.    This Court has personal jurisdiction over Defendants National Health Corporation and Infinity Care Partners because they are business entities organized under the laws of the state of Tennessee, are headquartered and operate physical locations and employ workers in Tennessee, and conduct business throughout Tennessee.

10.    A substantial part of the events or omissions giving rise to these claims occurred in Davidson and Rutherford Counties, Tennessee, within this judicial district. Therefore, proper venue for this action lies within the Middle District of Tennessee pursuant to 28 U.S.C. § 1391.

### III.    PARTIES

11.    Plaintiff Nerissa Precioso is a citizen of the Philippines and permanent resident of the United States who resides in Sumner County, Tennessee. She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from October 2022 to April 2023.

12.    Plaintiff Jan Vincent Austria is a citizen of the Philippines and permanent resident of the United States who resides in Pennsylvania. He is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from October 2022 to April 2023.

13.    Plaintiff Patrick Borja is a citizen of the Philippines and permanent resident of the United States who resides in Knox County, Tennessee. He is a licensed Registered Nurse who

3

was recruited by ICP to work for NHC in Tennessee and worked for NHC from December 2022 to January 2023.

14. Plaintiff Lizalynn Cabral is a citizen of the Philippines and permanent resident of the United States who resides in Williamson County, Tennessee. She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Massachusetts and worked for NHC in Tennessee from August 2022 until November 2023.

15. Plaintiff Joy Chua is a citizen of the Philippines and permanent resident of the United States who resides in Hamilton County, Tennessee. She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Georgia and worked for NHC in Georgia from October 2022 until February 2024.

16. Plaintiff Marie Jodel Montalvo is a citizen of the Philippines and permanent resident of the United States who resides in Minnesota. She is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from February 2023 until September 2023.

17. Plaintiff Vincent Zaulda is a citizen of the Philippines and permanent resident of the United States who resides in Williamson County, Tennessee. He is a licensed Registered Nurse who was recruited by ICP to work for NHC in Tennessee and worked for NHC from August 2022 to January 2024.

18. All Plaintiffs are of Asian race and Filipino ethnicity.

19. At all times before and during their employment with Defendants, all Plaintiffs were citizens of the Philippines and not United States citizens.

20. Plaintiffs consent in writing to become party Plaintiffs in this action for claims under the FLSA. (*See* **Exhibit A**, Collective Action Consent Forms.)

4

21.     Defendant National Health Corporation (NHC) is a Tennessee for-profit, publicly traded corporation with its principal place of business located at 100 East Vine Street, Suite 1400, Murfreesboro, TN 37130.  It may be served through its registered agent: National Registered Agents, Inc., 300 Montvue Road, Knoxville, Tennessee 37919.  With the other Defendants, NHC participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.

22.     Defendant Jeffrey R. Smith is U.S. citizen and Tennessee resident.  He is the President and Treasurer of NHC.  Mr. Smith signed the illegal employment agreements with Plaintiffs.  With the other Defendants, Mr. Smith participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were within the scope of his office and employment, performed on behalf of NHC, authorized by NHC, and constituted a pattern of illegal activity, including forced labor and trafficking for forced labor, that NHC knew or should have known was occurring.

23.     Defendant Maria Wong is a U.S. citizen and Tennessee resident.  She is NHC's Corporate Director of Workforce Development. With the other Defendants, Ms. Wong participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were within the scope of her office and employment, performed on behalf of NHC, authorized by NHC, and constituted a pattern of illegal activity, including forced labor and trafficking for forced labor, that NHC knew or should have known was occurring.

5

24.     Defendant Infinity Care Partners, LLC (ICP) is a Tennessee limited liability company with its principal place of business located at 5016 Centennial Boulevard, Suite 200, Nashville, Tennessee 37209.  It may be served through its registered agent: Andrew Joseph Huckabay, 349 Raintree Drive, Hendersonville, Tennessee 37075.  ICP recruits nurses in the Philippines to work for NHC and other companies, including facilitating hiring, contracts, immigration, and travel.  With the other Defendants, ICP participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were performed on behalf of ICP, authorized by ICP, and constituted a pattern of illegal activity, including forced labor and trafficking for forced labor, that ICP knew or should have known was occurring.

25.     Defendants John Does 1-10 are individuals and/or entities whose true names and identities have not yet been ascertained but who work for or on behalf of Defendants NHC and/or ICP in the illegal actions pled herein.  With the other Defendants, Does 1-10 participated in and knowingly benefited financially from the scheme to recruit nurses from the Philippines under false pretenses, secure illegal contracts with them, and intimidate them from leaving once they began employment with NHC.  Such actions were performed on behalf of NHC and/or ICP, authorized by NHC and/or ICP, and constituted a pattern of illegal activity that NHC and/or ICP knew or should have known was occurring. Once such defendants have been properly identified through discovery, Plaintiffs will add them to this action as party defendants.

26.     Defendants comprise a venture as that term is used in the TVPA, 18 U.S.C. §§ 1589 and 1595 in that they are an undertaking and/or enterprise involving risk and profit. Specifically,

6

a.  NHC contracts with and pays ICP to provide Filipino nurses for NHC-run facilities throughout the United States;

b.  NHC profits because it earns significantly more income from the ICP-provided Filipino nurses' labor than their wages, benefits, and other costs of employment;

c.  NHC also profits by charging the Filipino nurses exorbitant penalties labeled as "liquidated damages" if they leave before the conclusion of their alleged contract period;

d.  ICP profits because NHC pays far more than ICP's actual costs to provide Filipino nurses to NHC; and

e.  ICP and NHC share risks, including potential legal expenses, financial impacts of changes in immigration policy, and exposure to potential liability for injuries suffered by the nurses and patients.

27.     The ICP-NHC venture is an ongoing business relationship that has continued for at least five years.

28.     Each Defendant is an individual or legal entity capable of holding a beneficial interest in property and therefore a "person" as that term is used in the RICO, 18 U.S.C. § 1961(3).

29.     All Defendants are associated in fact, though not a legal entity, and therefore are an enterprise ("RICO Enterprise I") as that term is used in RICO, 18 U.S.C. § 1961(4).

30.     Defendants NHC and ICP are associated in fact, though not a legal entity, and therefore are an enterprise ("RICO Enterprise II") as that term is used in the RICO, 18 U.S.C. § 1961(4).

31.     All Defendants were associated with RICO Enterprise I and/or RICO Enterprise II (collectively, "the RICO Enterprises").

7

32.     The RICO Enterprises are engaged in, or their activities affect, interstate or foreign commerce.

33.     NHC was an "employer" of Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 203(d).

34.     NHC is an enterprise engaged in commerce or in the production of goods for interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203(r) and (s) in that it has an annual gross volume of sales made or business done of not less than $500,000.

## IV.     FACTUAL ALLEGATIONS

### A.  The Defendants' Human Trafficking Scheme

35.     Defendants conducted or participated in RICO Enterprise I and/or RICO Enterprise II through the acts and omissions set forth in paragraphs 38-118, below, which constituted a pattern of racketeering.

36.     Alternatively, Defendant ICP conspired with Defendants Smith, Wong, Does 1-10, and NHC by adopting the goal of furthering and participating in the objectives of Defendants Smith, Wong, Does 1-10, and NHC to engage in acts and omissions set forth in paragraphs 38-118, below.

37.     The pattern of racketeering set forth below began, upon information and belief, in 2019 and continues to this day.

*Fraud and Coercion in the Recruitment and Immigration Process*

38.     Defendant NHC owns and operates over 150 residential medical facilities and home-health agencies in at least eight states, including nursing homes, assisted living facilities, hospice agencies, homecare agencies, and behavioral health hospitals, caring for thousands of patients each day.

8

39.     Many of NHC's facilities are located in rural areas in the Southeast where there may be a shortage of qualified medical professionals to care for patients. Therefore, NHC takes advantage of immigration programs through which U.S. companies can hire skilled workers from overseas.

40.     Defendant ICP is a recruiting agency that recruits international nurses to work for U.S. healthcare companies in the United States, including NHC. It maintains offices in the United States and in the Philippines.

41.     At all relevant times, NHC used ICP to recruit Filipino nurses to work at its U.S. facilities. At all steps of the process, ICP and NHC were aware of each other actions and worked together to secure placement of Plaintiffs and other Filipino nurses at NHC's facilities. Together, they operated and continue to operate an illegal human trafficking scheme, as described in the following paragraphs.

42.     ICP recruited Plaintiffs and other Filipino nurses to apply for healthcare jobs in the United States by promising the process is "free."

43.     ICP's Philippines office facilitated initial contact with NHC for Plaintiffs and other Filipino nurse candidates.

44.     When NHC decided to hire the Plaintiffs and other Filipino nurses, ICP presented them with two documents simultaneously or within close proximity: an Offer Letter and the ICP Immigration Services Agreement.

45.     Specifically, ICP sent the Offer Letters and Immigration Services Agreements by electronic mail to the Plaintiffs, and Plaintiffs signed and returned them, as follows (*see* **Exhibit B**, Offer Letters; **Exhibit C**, ICP Agreements):

| Date Sent | Date Signed | Plaintiff | ICP Signer |
|-----------|-------------|-----------|------------|
| 3/1/2021 | 3/3/2021 | Narissa Precioso | Simon John T. Corocoto |
| April 2021 | 4/7/2021 | Lizalynn Cabral | Unknown[1] |
| 4/23/2021 | 4/26/2021 | Vincent Zaulda | Simon John T. Corocoto |
| 5/5/2021 | 5/5/2021 (Offer Letter); 5/18/2021 (Agreement) | Patrick Borja | Simon John T. Corocoto |
| 5/7/2021 | 5/10/2021 | Joy Chua | Simon John T. Corocoto[2] |
| 7/9/2021 | 7/12/2021 | Jan Vincent Austria | Allison Womack |
| 7/9/2021 | 7/9/2021 (Offer Letter); 7/13/2021 (Agreement) | Marie Jodel Montalvo | Allison Womack (Offer Letter); Simon John T. Corocoto (Agreement) |

46.     The Offer Letter was sent by ICP, on ICP letterhead, and stated the location, rate of pay, shift, and benefits of the Plaintiffs' and other Filipino nurses' employment with NHC.

47.     The Offer Letter also stated that a "separate employment contract" with NHC would be sent to the nurses later.  The Offer Letter sometimes stated a "contract duration" of three years, but sometimes did not mention a contract duration at all.

48.     The ICP Immigration Services Agreement (the "ICP Agreement") set out the services provided by ICP to aid the Plaintiffs, other Filipino nurses, and their families with the immigration process. It stated that, in the event the nurse did not complete the process, he or she would owe ICP up to $11,000 in fees, plus attorneys' fees and costs.  This penalty was in the form of tiered repayment obligations that increased up to $11,000 depending on the stage of the immigration process at which the nurse withdrew.

49.     The Offer Letter instructed the Plaintiffs and other Filipino nurses to sign and return both the Offer Letter and the ICP Service Agreement within three to five days of receipt.

50.     The Offer Letter promised, "[Y]ou will also receive the following benefits from

---

[1] Plaintiffs will amend this Complaint to add additional facts as such facts are uncovered through discovery.

[2] Mr. Corocoto later sent a "corrected" Offer Letter, also dated May 7, 2021, to Ms. Chua.

Infinity Care Partners upon acceptance of the ICP Immigration Service Agreement[:] Fast and Transparent Immigration Process[,] 24/7 Local Recruiter Assistance[,] Free Airfare to the United States[,] Free 1st Month Housing[,] Paid Immigration related fees including I-140 Premium Application Fee, Visa Fee Bill, and Immigration Lawyer Fees[,] Reimbursement of fees for NCLEX, IELTS, Visascreen, and State License[, and] Personalized Meet and Greet, U.S. transition service" (emphasis in original).

51.     The Offer Letter and ICP Agreement did *not* contain any terms that subjected Plaintiffs and the other Filipino nurses to penalties or repayment obligations if they completed the immigration process.  In other words, the Offer Letter and ICP Agreement represented that, by entering into the ICP Agreement and completing the process set out therein, Plaintiffs and other Filipino nurses would receive the enumerated immigration services and benefits from ICP, without any further payment or charges.

52.     At the time ICP sent the Offer Letters and ICP Agreements, ICP knew it, on behalf of NHC, would send a separate agreement to the Plaintiffs and other Filipino nurses and that this Agreement contained a Liquidated Damages Penalty under which the nurses would be expected to "repay" NHC for the immigration process. Among other things,

          a.     ICP transmitted the NHC Agreement to the Plaintiffs and other Filipino nurses for their signatures via electronic mail;

          b.     ICP representatives reviewed the Offer Letter, ICP Agreement, and NHC Nursing Employment Agreement ("NHC Agreement"), which contained the Liquidated Damages Penalty, with the Plaintiffs and other Filipino nurses;

          c.     ICP representatives coached the Plaintiffs and other Filipino nurses not to disclose the Liquidated Damages Penalty during their consular interviews;

d.     The ICP Offer Letter contained details regarding the terms of the NHC Agreement, including the facility, rate of pay, and (sometimes) contract duration stated in the NHC Agreement (see ¶¶ 46-47, *supra*);

e.     ICP and NHC used the same immigration attorney to represent them and the Filipino nurses in the visa application process;

f.     Upon information and belief, NHC would notify ICP when Filipino nurses, including the Plaintiffs, left their employment and that they allegedly owed money under the Liquidated Damages Penalty.  ICP would then assist NHC in trying to collect. For example, ICP representatives threatened Jan Vincent Austria with serious financial and reputational harm when he left his employment with NHC (*see* ¶ 78, *infra*); and

g.     ICP places Filipino nurses with employers other than NHC, and those employers use nearly identical agreements, including Liquidated Damages Penalties in the same $40,000 amount. Thus, it is reasonable to infer ICP drafted or helped draft the NHC Agreement and the identical agreements with other employers.

53.     The Offer Letter and ICP Agreement thus contained material and fraudulent misrepresentations that ICP knew were false and that they intended to, and did, deceive Plaintiffs and other Filipino nurses, including but not limited to representing that the immigration process would be "free" or paid for by ICP and/or failing to disclose the Liquidated Damages Penalty in the later NHC Agreement under which the nurses would be expected to "repay" NHC  multiples of the cost of that process, as set out below.

54.     In reliance on the misrepresentations in the Offer Letters and ICP Agreements, Plaintiffs countersigned the Offer Letters and ICP Agreements, as set out above (*see* ¶ 45 and accompanying table, *supra*).

55.     Only after the Plaintiffs and other Filipino nurses signed the Offer Letter and the

ICP Agreement under these threats did ICP and NHC send the Plaintiffs and other Filipino nurses

a copy of the NHC Nursing Employment Agreement (the "NHC Agreement"), which Defendant

Jeffrey Smith signed on behalf of NHC.  (*See* **Exhibit D**, NHC Agreements.)

56.     Specifically, ICP transmitted the NHC Agreements to Plaintiffs via DocuSign,

which the Plaintiffs completed and sent back to ICP as follows:

| Plaintiff | Agreement Dated | Date Plaintiff Signed | NHC Signatory |
|---|---|---|---|
| Narissa Precioso | 3/24/2021 | 3/25/2021 | Defendant Jeffrey Smith |
| Lizalynn Cabral | 4/19/2021; 7/17/2022[3] | 4/21/2021; 7/18/2022 | Defendant Jeffrey Smith |
| Vincent Zaulda | 4/30/2021 | 5/3/2021 | Defendant Jeffrey Smith |
| Patrick Borja | 5/21/2021 | 5/22/2021 | Defendant Jeffrey Smith |
| Joy Chua | 5/21/2021 | 6/3/2021 | Defendant Jeffrey Smith |
| Jan Vincent Austria | 8/3/2021 | 8/4/2021 | Defendant Jeffrey Smith |
| Marie Jodel Montalvo | 8/3/2021 | 9/22/2021 | Defendant Jeffrey Smith |

57.     The NHC Agreement contained illegal, unconscionable, and coercive terms,

including the following:

     a.     NHC, in its sole discretion and at any time, could reassign the nurse for a

three-year period to a different NHC facility;

     b.     A complete ban on seeking employment with any person or entity other than

NHC for at least three years (the "Noncompetition Penalty");

     c.     A termination clause that allowed NHC to terminate the contract at any time

in its sole discretion but did not allow the nurse to terminate the contract *for any reason*;

---

[3] Ms. Cabral signed two agreements with NHC.  The first was for employment at NHC's Buckley HealthCare Center facility in Greenfield, Massachusetts, signed in April 2021.  The second was for employment at NHC's NHC Franklin facility in Franklin, Tennessee, signed in July 2022.  As detailed below, Ms. Cabral was informed while she was at the airport, waiting to leave the Philippines for the United States, that she would be working in Tennessee instead of in Massachusetts (*see* ¶¶ 69-70, *infra*).

13

and

       d.     A one-way liquidated damages penalty of $40,000 if the nurse failed to complete his or her NHC assignment for *any reason*, in addition to a requirement that the nurse reimburse all NHC's costs and expenses, including attorneys' fees, for legal action to recover this amount, all due within 90 days of the demand (the "Liquidated Damages Penalty").

58.     Because the Plaintiffs and other Filipino nurses had already signed the Offer Letter and ICP Agreement before they were presented with the NHC Agreement, Defendants intended to, and did, make the Plaintiffs and other Filipino nurses believe they have no choice but to sign it and to continue through with the process of becoming employed by NHC under threat of financial harm and loss of their immigration status, as set out in the ICP Agreement.

59.     Upon securing the NHC Agreement through these threats, NHC, with assistance from ICP, applied for permission from the U.S. Department of Labor to hire the Plaintiffs and other Filipino nurses as an employer sponsor.

60.     NHC, ICP, and the Plaintiff or other Filipino nurse whose name appeared on the applications were all represented by the same immigration attorney during the immigration and certification process.

61.     ICP prepared the U.S. Department of Labor submissions, with the assistance of the attorney, and NHC signed them.

62.     Defendants materially misrepresented the terms and conditions of Plaintiffs' and other Filipino nurses' employment on the applications to the U.S. Department of Labor, including but not limited to by underreporting Plaintiffs' and other Filipino nurses' education and

14

experience, misrepresenting the positions Plaintiffs and other Filipino nurses would fill, and/or misrepresenting the NHC locations where Plaintiffs and other Filipino nurses would work.

63.     Specifically, Defendants submitted documents to the United States government regarding Plaintiff's employment and immigration, including but not limited to Applications for Permanent Labor Certification (ETA Form 9089) submitted to the U.S. Department of Labor and Immigrant Petitions for Alien Workers (Form I-140) submitted to the U.S. Department of Homeland Security (which also incorporated the ETA Form 9089), as follows:

| Plaintiff | Date of I-140 Application |
|---|---|
| Lizalynn Cabral | 2021 |
| Vincent Zaulda | 2021[4] |
| Patrick Borja | 8/30/2021 |
| Joy Chua | 8/18/2021 |
| Narissa Precioso | 9/3/2021 |
| Jan Vincent Austria | 9/22/2021 |
| Marie Jodel Montalvo | 1/11/2022 |

64.     For example, Plaintiffs' and other Filipino nurses' permanent labor certification and immigration petitions stated that they would not supervise other employees, that their positions were "entry level," and that the positions did not require experience or training.  However, NHC's Registered Nurse (RN) Job Description, which Plaintiffs and other Filipino nurses received after they arrived in the United States, stated that RNs were responsible for the supervision (including hiring, firing, and discipline) of nursing assistants and other employees; the NHC Agreement required they have at least one year of clinical nursing experience; and applications submitted to NHC after they arrived in the U.S. stated a "preferred" training level of "Expert."

65.     Even when Plaintiffs and other Filipino nurses were reassigned to different NHC facilities, Defendants did not update the forms submitted to the U.S. Department of Labor and U.S.

---

[4] Plaintiffs will amend this Complaint to add additional facts as such facts are uncovered through discovery.

Department of Homeland Security, despite the fact that the permanent labor certification and prevailing wage determination were specifically dependent on the location of the immigrant nurses' employment.

66. Because the Liquidated Damages Penalty is illegal under Filipino law, NHC, through and with the knowledge of ICP, presented signed and notarized letters to the U.S. Embassy or Consulate that did not accurately reflect the true terms of the Plaintiffs' and other Filipino nurses' contracts with NHC in order to ensure their applications were approved. For example, among other omissions and misrepresentations, these letters did not disclose that NHC and the nurses had an Employment Agreement, much less the terms of the NHC Agreement; underreported the job duties and level of responsibility the NHC RN position required; sometimes misstated the facility where the nurse would work or the wages the nurses would receive; and claimed that the wages paid to the nurses "meets the prevailing wage," even when it did not. These letters were sent as follows:

| Plaintiff | Date of Letter | Signed for NHC By |
|---|---|---|
| Jan Vincent Austria | 2022 | Unknown |
| Marie Jodel Montalvo | 2022[5] | Unknown |
| Vincent Zaulda | 3/11/2022 | Defendant Jeffrey Smith |
| Lizalynn Cabral | 5/16/2022 | Defendant Jeffrey Smith |
| Joy Chua | 6/2/2022 | Defendant Jeffrey Smith |
| Narissa Precioso | 6/28/2022 | Defendant Jeffrey Smith |
| Patrick Borja | 8/31/2022 | Christopher West |

67. Likewise, ICP, acting with the knowledge of and on behalf of NHC, coached Plaintiffs and other Filipino nurses on what they should say during their Consulate interviews to ensure these and other misrepresentations made during the immigration process were not discovered.

---

[5] Plaintiffs will amend this Complaint to add additional facts as such facts are uncovered through discovery.

16

68.     Once the government approved Plaintiffs' and other Filipino workers' immigration and the visas were secured, ICP, acting on behalf of NHC, arranged for transportation to the United States.

*Illegal and Coercive Employment Practices*

69.     Commonly, and sometimes days or even hours before their travel, NHC and ICP reassigned nurses to facilities other than those specified in their original contracts and applications for foreign labor certification submitted to the U.S. Department of Labor. For example, Plaintiff Lizalynn Cabral signed the NHC Agreement for placement in Massachusetts in April 2021. On July 14, 2022—while she and her family were *at the airport* and waiting to board a plane to the United States—ICP and NHC, through Defendant Maria Wong, informed Ms. Cabral that she would be placed in Tennessee instead of Massachusetts.

70.     These last-minute changes caused significant hardship for Plaintiffs like Ms. Cabral and the other Filipino nurses who experienced them, such as more expensive last-minute plane tickets for their families, having to rearrange delivery of purchases like cars and personal items, and finding places to live that were available immediately. Additionally, with only hours of notice, they were expected to adjust to different cultures, costs of living, climates, living arrangements, schools, and communities than those they had been preparing for throughout the years-long immigration process, which caused significant financial, mental, and emotional stress and hardship.

71.     The escalating liquidated damages provisions in the ICP Agreement and the subsequent NHC Agreement, the "bait and switch" misrepresentations about the terms and conditions of employment, the misrepresentations submitted to the U.S. Embassies and federal agencies, and the illegal terms in the ICP Agreement and NHC Agreement constituted an

17

intentional abuse of legal process—Plaintiffs' and other Filipino nurses' entry into the United States with U.S. government work authorization—through which ICP provided and NHC obtained Plaintiffs' and other Filipino nurses' labor.

72.     NHC, with ICP's knowledge, often placed the Filipino nurses at jobs in rural areas where they were isolated and without easy access to travel, services, and other resources.

73.     When the Plaintiffs and other Filipino nurses began work, NHC, with ICP's knowledge, did not provide proper training, staffing, equipment, and other resources needed for them to do their jobs safely and professionally.

74.     While working for NHC, Plaintiffs and other Filipino nurses were often subjected to discriminatory, illegal, and dangerous conditions that threatened their own and their patients' safety and health.

75.     Defendant NHC did not pay Plaintiffs and other Filipino nurses the required prevailing wage corresponding to the skill level of the work the Plaintiffs were required to perform.

76.     When, in order to protect their licenses, careers, and patients, the Plaintiffs and other Filipino nurses felt compelled to resign from their employment with NHC, NHC (often through Defendant Maria Wong) and ICP would threaten, coerce, and intimidate them to try to force them to return to work by threatening financial harm or legal action under the NHC Agreement and ICP Agreement.

77.     These tactics included, but were not limited to, false imprisonment (by NHC); threatening and harassing calls, emails, and text messages; retaining debt collectors; sending attorney demand letters; and filing of civil lawsuits.

78.     These interactions included explicit and implied threats that the Plaintiffs' and other Filipino nurses' or their family's immigration status could be revoked, that they would be sued,

and that they owed tens of thousands of dollars that must be paid within 90 days or less unless they remained employed by NHC under the terms of their illegal contracts. Some examples of these tactics included, but were not limited to, the following:

a. When Plaintiff Marie Jodel Montalvo resigned from her employment at NHC Pulaski in September 2023 because of unsafe working conditions for her and the residents at the facility, NHC caused her to be falsely imprisoned in the office of the facility administrator (who, upon information and belief, is the son of Defendant Maria Wong) and told her she could not leave the room until she signed a letter agreeing that she owed NHC $33,333.33. She was only allowed to leave when she called an attorney who threatened to call 911 if Ms. Montalvo was not released.

b. Despite the NHC Agreement's provision stating that she had 90 days to pay this amount, less than one month later, on October 3, 2023, Defendant NHC filed a lawsuit against Plaintiff Marie Jodel Montalvo to enforce the $40,000 liquidated damages penalty in NHC's contract (M.D. Tenn. Case No. 1:23-cv-00074). The lawsuit also seeks damages for unjust enrichment, attorneys' fees, costs, interest, and equitable relief.

c. After Plaintiff Vincent Zaulda provided NHC with 30 days' notice of his intent to resign from his employment, NHC required that he meet with his facility administrator so NHC could demand the money Defendants claimed he owed. When Mr. Zaulda refused to attend this meeting because he feared for his safety, NHC refused to schedule Mr. Zaulda to work until he did. Despite giving the 30 days' notice required under NHC's policies to be paid out his earned vacation and sick pay, NHC refused to pay these benefits, in violation of Tennessee law, because it claimed Mr. Zaulda owed money under the Liquidated Damages Penalty. These actions resulted in Mr. Zaulda losing wages

and benefits to which he was entitled under his contract and NHC's policies. Mr. Zaula resigned from his employment in December 2023, after sixteen months of work, due to unsafe working and patient conditions and lack of proper training.

d.      In or about September 2023, after Plaintiff Jan Vincent Austria refused repeated payment demands by NHC, Defendants caused ICP employee Rachel Kamau to contact another Filipino nurse regarding the payment demand made to Mr. Austria. Ms. Kamau told the other nurse that "[Mr. Austria's] payback needs to be done," it was "not a good thing to not respond to your former employer," and threatened that NHC would "send him to collection for his debt," "ruin his credit," and withhold tax documents from him if he did not give in to their demands. By sending this threat to Mr. Austria through another Filipino nurse, Defendants ensured not only Mr. Austria but also other Filipino nurses understood the severe financial and reputational harm Defendants would inflict on any Filipino nurses who left NHC.

e.      On October 13, 2023, Defendant NHC sent an attorney demand/debt collection letter to Plaintiff Nerissa Precioso claiming she owed NHC $44,906.66 in penalties, including over $12,000 in attorneys' fees and costs for the demand letter. The letter threatened to sue Ms. Precioso unless she paid the amount in full within 90 days. Ms. Precioso was forced to resign in April 2023 after seven months of work due to unsafe working and patient conditions and being forced to perform supervisor-level job duties without proper training or compensation and in violation of her contract.

f.      On April 9, 2024, Defendants NHC and Maria Wong sent demand/debt collection letters to several Filipino nurses, including Plaintiffs Lizalynn Cabral, Jan Vincent Austria, and Vincent Zaulda, claiming they owed NHC under the Liquidated

20

Damages Penalty. The letter threatened legal action against Ms. Cabral, Mr. Austria, Mr. Zaulda, and the other Filipino nurses who received the letters unless they responded within 30 days and paid the full amount demanded within 90 days. The amounts demanded from Plaintiffs ranged from $18,000 to $37,333.33 and, in at least two cases, were different than the amounts NHC originally demanded when Plaintiffs fled. Ms. Cabral, Mr. Austria, and Mr. Zaulda were each forced to resign due to unsafe working and patient conditions, unfair and discriminatory wages, and/or lack of proper training. The written demands and oral threats made to Plaintiffs and other Filipino nurses stated that the money demanded was to reimburse NHC for the money NHC had spent during the immigration process and/or to reimburse NHC for the fees it paid to ICP, despite the fact that the Offer Letter and ICP Agreement both specified that these services were provided "free" or paid for by *ICP*.

79. Despite the terms of the Offer Letter and ICP Agreement, in which ICP explicitly told Plaintiffs and other Filipino nurses that immigration services were "free" or would be paid for by ICP, ICP sent harassing and threatening text messages, emails, phone calls, and/or other communications telling Plaintiffs and other Filipino nurses that they owed money to ICP and/or NHC after their employment with NHC ended.

80. For example, ICP sent demands for money allegedly owed to ICP by email to Plaintiff Patrick Borja on October 31, 2023, and to Plaintiff Joy Chua on January 26, 2024, and July 24, 2024.

81. These demands for "repayment" by both NHC and ICP are in violation of U.S. Department of Labor regulations regarding the permanent labor certification process, which prohibit employers from requiring immigrant employees to pay the fees and costs of the labor

certification process, including attorneys' fees and fees for recruitment. *See*, *e.g.*, 20 C.F.R. § 656.12.

82.     These demands are continuing and ongoing, with both NHC and ICP sending demands for repayment to Plaintiffs and similarly situated Filipino nurses as recently as July 2024, after the filing of this action.

83.     By using these illegal, threatening tactics and financial and legal penalties, the Defendants have engaged in a deliberate scheme, pattern, and plan intended to cause Plaintiffs and other Filipino nurses to believe that they would suffer serious harm and physical restraint if they tried to leave Defendants' employ and find other employment.

84.     The Plaintiffs and other Filipino nurses were aware of these and other retaliatory and discriminatory actions the Defendants took or threatened to take. Therefore, the Plaintiffs and other Filipino nurses reasonably believed they would suffer similar serious harm and physical restraint if they left or tried to leave.

85.     NHC's detention of Plaintiff Marie Jodel Montalvo was physical restraint NHC intended would obtain Ms. Montalvo's continuing labor and cause the other nurses to believe they would suffer physical restraint if they did not continue to work for the NHC.

86.     The penalty provision in the ICP Agreement and the Liquidated Damages Penalty in the NHC Agreement were intended to cause the Plaintiffs and other Filipino nurses to believe that they would suffer serious financial harm and abuse of legal process if they tried to leave Defendants' employ and find other employment. Defendant Maria Wong explicitly told other nurses that NHC was suing Ms. Montalvo to "make an example" of her for other Filipino nurses.

87.     The ICP penalty provision and the NHC Liquidated Damages Penalty were arbitrary and disproportionate to the respective Defendant's actual costs.

22

88.    Additionally, or in the alternative, the Liquidated Damages Penalty was intended to recoup recruitment fees, legal fees, and other costs of the immigration and labor certification process which employers are legally prohibited from recouping from immigrant employees.

89.    Upon information and belief, NHC had contracts with Filipino nurses recruited through other agencies for whom the Liquidated Damages Penalty was less than $40,000, illustrating that the number was arbitrary and/or based on a number other than NHC's actual costs.

90.    The Liquidated Damages Penalty was disproportionate to the compensation paid to Plaintiffs and the other Filipino nurses.

91.    Likewise, Defendant NHC intended the Noncompetition Penalty (which was enforced through the Liquidated Damages Penalty) to cause the Plaintiffs and other Filipino nurses to believe that they would suffer serious harm, including financial harm, and abuse of legal process if they left their employment with NHC to work for another company as a nurse.

92.    The Defendants' use of actual and threatened legal action was a deliberate scheme, pattern, and plan intended to send a message to the Plaintiffs and other Filipino nurses that they would face civil litigation and incur substantial financial harm—including the penalty in the ICP Agreement, the $40,000 Liquidated Damages Penalty along with NHC's attorneys' fees and costs under the NHC Agreement, and the inability to find other work under the Noncompetition Penalty in the NHC Agreement—if they stop working for NHC.

93.    The Defendants' use of actual and threatened legal action constitutes the use of a law or legal process for a purpose for which the law was not designed, in order to exert pressure on the Plaintiffs and other Filipino nurses to continue working for NHC under discriminatory, illegal, and dangerous conditions and to prevent them from leaving their employment with NHC.

23

94.     Likewise, the Defendants' misuse of the U.S. Department of Labor foreign labor certification process, including by misrepresenting the terms and conditions Plaintiffs' and other Filipino nurses' employments and by employing (NHC) or providing for employment (ICP) Plaintiffs and other Filipino nurses under terms and conditions that are explicitly prohibited by U.S. Department of Labor regulations, constitutes the use of a law or legal process for a purpose for which the law was not designed, in order to exert pressure on the Plaintiffs and other Filipino nurses to begin and continue working for NHC under discriminatory, illegal, and dangerous conditions and to prevent them from leaving their employment with NHC.

95.     Based on these threats and actions, Plaintiffs and other similarly situated Filipino nurses reasonably feared serious financial, professional, reputational, and psychological harm if they did not continue working for Defendants, despite the conditions under which they are forced to work.

96.     Through this illegal trafficking scheme, NHC and ICP maintained and continue to maintain the forced labor of the nurses.

97.     Through this illegal trafficking scheme, ICP and NHC provided Plaintiffs and other Filipino nurses for forced labor.

98.     Though this illegal trafficking scheme, NHC obtained Plaintiffs and other Filipino nurses for forced labor.

99.     Defendants recruited Plaintiffs and other Filipino nurses and transported them (and/or caused them to be transported) to and within the United States for the purpose of forced labor, thereby trafficking the Plaintiffs and other Filipino nurses for forced labor.  Sometimes, Plaintiffs and other Filipino nurses did not know where in the U.S. they were going until shortly— sometimes only hours—before they left the Philippines.  Other times, Plaintiffs and other Filipino

24

nurses were explicitly instructed not to tell Consulate or other officials where they actually would be employed.

*Venture Liability*

100.     Defendants knowingly benefited financially from participating in the venture with each other and which Defendants knew or should have known, *inter alia*:

a.     Provided and/or obtained Plaintiffs' and other Filipino nurses' labor through misrepresentations about the terms and conditions of employment in the process of securing their entry into and employment in the United States;

b.     Provided and/or obtained Plaintiffs' and other Filipino nurses' labor by threatening to enforce the damages provision in the ICP Agreement (ICP), threatening and bringing litigation to enforce the illegal Liquidated Damages Penalty (NHC), and additionally seeking attorneys' fees and costs associated with that actual or threatened litigation (NHC);

c.     Provided and/or obtained Plaintiffs' and other Filipino nurses' labor by means of a scheme, plan, or pattern intended to cause the nurses to believe that, if they did not continue working for NHC, they would be unable to work for any other person or entity for a period of at least three years; and

d.     Provided and/or obtained Plaintiffs' and other Filipino nurses' labor by means of a scheme, plan, or pattern intended to cause the nurses to believe that, if they did not continue working for NHC, they would suffer financial, legal, personal, professional, psychological, and reputational harm or physical restraint.

101.    Defendant ICP benefitted from its participation in the venture by, *inter alia*, receiving income through fees from NHC to recruit, provide immigration services, and provide Plaintiffs' and other Filipino nurses' labor to Defendant NHC.

102.    Defendant NHC benefitted from its participation in the venture by, *inter alia*, receiving the value of Plaintiffs' and other Filipino nurses' labor and by maintaining Plaintiffs and other Filipino nurses as a captive workforce. With a captive workforce, NHC reduced staffing levels and provided a quality of care to its customers that was below industry standards and rules, thereby reducing overhead costs and increasing profits.

<u>*Conspiracy*</u>

103.    Defendant ICP conspired with Defendant NHC to subject the Plaintiffs and other Filipino nurses to forced labor and trafficking for forced labor.

104.    Defendant ICP agreed with Defendant NHC to commit forced labor and trafficking for forced labor.

105.    Defendant ICP knew of NHC's goal to subject Plaintiffs and other Filipino nurses to forced labor and trafficking for forced labor, and ICP voluntarily participated in helping to accomplish that goal.

106.    The affirmative steps Defendant ICP took to help NHC accomplish its goal include those set forth in paragraphs 38-118.

<u>*Attempt*</u>

107.    If Defendants did not complete the acts constituting forced labor and trafficking for forced labor, Defendants, in the alternative, attempted to do so.

108.    By intentionally drawing Plaintiffs and other Filipino nurses into a scheme whereby they would not be able to leave their employment with NHC without incurring serious financial

and reputational harm, Defendants (a) acted with the kind of culpability otherwise required for the commission of forced labor and trafficking for forced labor, and (b) engaged in conduct, as set forth in paragraphs 38-118, that constituted substantial steps toward the commission of forced labor and trafficking for forced labor.

<em>Discrimination</em>

109. Defendants did not subject non-Asian, non-Filipino, and/or U.S. citizen employees to forced labor, trafficking for forced labor, or illegal contracts. Only Plaintiffs and other Filipino nurses were subject to the ICP Agreement and the NHC Agreement.

110. Defendant ICP's business model is to recruit foreign nurses for recruitment to U.S. positions, including to NHC; it does not employ or recruit U.S. citizens. Upon information and belief, the vast majority of the international nurses recruited by ICP to NHC come from the Philippines.

111. Thus, ICP targeted Plaintiffs and other similarly situated Filipino nurses for the Defendants' labor trafficking and forced labor scheme because of their race, ethnicity, and/or citizenship status. ICP did not subject non-Asian, non-Filipino, and/or U.S. citizen employees to the misrepresentations and penalties found in the Offer Letter, ICP Agreement, and NHC Agreement or to its labor trafficking or forced labor scheme with NHC.

112. Defendant NHC and ICP's non-Filipino employees were aware of the forced labor and trafficking for forced labor of the Plaintiffs and other Filipino nurses and knew that they were not free to leave their employment with NHC. This caused NHC and NHC's non-Filipino managers and other employees to intentionally discriminate against Plaintiffs and other Filipino nurses based on their race, ethnicity, and citizenship, through actions including but not limited to the following:

a.     Assigning Plaintiffs and other Filipino nurses to undesirable positions, duties, shifts, and/or hours;

b.     Employees refusing to assist or aid Plaintiffs and other Filipino nurses in carrying out their duties;

c.     Employees refused to carry out their own job duties when instructed by Plaintiffs and other Filipino nurses;

d.     Issuing reprimands and discipline to Plaintiffs and other Filipino nurses that were disproportionately harsh and different than the reprimands and discipline issued to non-Asian, non-Filipino, and/or U.S. citizen employees for similar conduct;

e.     Subjecting Plaintiffs and other Filipino nurses to bullying, harassing, and discriminatory comments and treatment, such as calling them "dumb," telling them not to speak "Filipino," saying they couldn't speak English, and mimicking and mocking their accents;

f.     Refusing to pay Plaintiffs and other Filipino nurses in accordance with their contracts, skill levels, positions, and/or duties; and

g.     Refusing to remedy and retaliating against Plaintiffs and other Filipino nurses when they reported and opposed this discrimination.

113.    Specifically, NHC subjected Plaintiffs and other Filipino nurses to the following discriminatory acts, *inter alia*:

a.     All Plaintiffs and other Filipino nurses were required to sign the NHC Agreement, while similarly situated non-Asian, non-Filipino, and/or U.S. citizen comparators were not;

b.      All Plaintiffs and other Filipino workers were subjected to physical, financial, and/or legal threats, as set out above, while similarly situated non-Asian, non-Filipino, and/or U.S. citizen comparators were not;

c.      All Plaintiffs received harassing and threatening letters, phone calls, text messages, and/or emails, often sent by their facility Administrator, Director of Nursing, ICP representatives, and/or Defendant Maria Wong, regarding the money they allegedly owed to NHC and/or ICP, while non-Asian, non-Filipino, and/or U.S. citizen comparators were not subject to such communications;

d.      Plaintiff Jan Vincent Austria was prohibited from "moonlighting" or taking a second job, while NHC policy allowed moonlighting with a supervisor's permission and, upon information and belief, non-Asian, non-Filipino, and/or U.S. citizen employees were given such permission;

e.      Plaintiff Nerissa Precioso was forced to work as a Charge Nurse without additional compensation even after she declined a promotion to Charge Nurse, while non-Asian, non-Filipino, and/or U.S. citizen employees were not required to perform additional duties without their consent and without additional compensation;

f.      Plaintiff Vincent Zaulda was denied payment for over 200 hours of accrued PTO to which he was entitled under NHC's written policies upon his discharge, while non-Asian, non-Filipino, and/or U.S. citizen employees were paid out PTO according to NHC policy upon their separation from NHC;

g.      Plaintiffs, including Jan Vincent Austria and Marie Montalvo, had their shifts and/or schedules changed without their consent and were not given predictable hours,

often reducing their work time to less than full-time, while other non-Asian, non-Filipino, and/or U.S. citizen employees were not subjected to these changes;

h.      Plaintiffs, including Vincent Zaulda, were required to perform additional duties outside their own RN jobs, such as blood draws that should have been performed by a phlebotomist and tasks that nursing assistants refused to perform, while other non-Asian, non-Filipino, and/or U.S. citizen employees were not required to do so;

i.      Plaintiff Lizalynn Cabral, on behalf of herself and other Filipino nurses at her facility including Plaintiff Vincent Zaulda, reported the discrimination and bullying they experienced to their NHC supervisors, but nothing was done;

j.      Plaintiffs, including Lizalynn Cabral, requested transfers to other NHC facilities in order to secure better treatment and terms and conditions of work, but these transfers requests were denied or ignored, while upon information and belief, other non-Asian, non-Filipino, and/or U.S. citizen nurses were allowed to transfer facilities; and

k.      Plaintiffs were expected to cover entire halls (with 25-35 patients in need of specialized care) as the only RN on duty, while non-Asian, non-Filipino, and/or U.S. citizen employees were not required to do so.

114.    Additionally, Defendants' illegal trafficking scheme applied only to Plaintiffs and other similarly situated Filipino nurses.  Defendants did not subject non-Asian, non-Filipino, and/or U.S. citizen workers to the same treatment.

115.    For example, the Breach of Employment Contract and Demand for Repayment form NHC presented to Plaintiffs and other Filipino nurses upon their discharges had three signature lines: one for the facility Administrator, one for the Director of Nursing, and one for

30

"International RN," showing the NHC Agreement and repayment threats were only made to non-citizen nurses like Plaintiffs.

116.    ICP was aware of these demands for payment, including their discriminatory nature, and nonetheless helped NHC to collect, including by sending harassing and threatening communications to Plaintiffs and other Filipino nurses, as detailed above.  ICP did not make such demands against nurses who were non-Asian, non-Filipino, and/or U.S. citizens.

117.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other similarly situated Filipino nurses have suffered financial and economic harm.

118.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other similarly situated Filipino nurses have suffered adverse consequences to their physical, emotional, and/or mental health; stress, anxiety, anguish, embarrassment, humiliation, inconvenience, loss of enjoyment of life, reputational and/or professional harm; and have incurred attorneys' fees, costs, and litigation expenses.

### B.    Class Action Claims (Against All Defendants)

119.    Defendants' conduct described above was part of and resulted from policies and practices that the defendants applied to all Filipino nurses they recruited and employed.  Plaintiffs therefore bring the claims alleged herein as a class action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

120.    The class is comprised of all nurses who were recruited by the Defendants from the Philippines and began employment with NHC within the United States on or after May 6, 2014 (the "Nationwide Class").

121.    In the alternative, subclasses are comprised of:

31

a.   **Subclass 1:** All nurses who were recruited by Defendants from the Philippines and began employment with NHC within Tennessee on or after May 6, 2014 (the "Tennessee Subclass").

b.   **Subclass 2:** All nurses who were recruited by Defendants from the Philippines and began employment with NHC within Georgia on or after May 6, 2014 (the "Georgia Subclass").

122.   The term "Classes" as set forth in this Complaint shall refer to the Nationwide Class or, in the alternative, the Tennessee Subclass and the Georgia Subclass.

123.   Plaintiffs reserve the right to amend the definitions of the Classes based on discovery or legal developments, as appropriate.

124.   Plaintiffs are members of the Classes they seek to represent.

125.   Plaintiffs do not know the exact number of members of the Classes, but the number of members of the Classes is greater than can be feasibly addressed through joinder. Upon information and belief, NHC currently has more than ten thousand employees. Based on Plaintiffs' experiences, NHC employs at least 3-5 Filipino nurses in each of its facilities. Therefore, Plaintiffs believe that NHC employs at least several hundred Filipino nurses over its more than 150 facilities, including more than 40 nurses in Tennessee and Georgia, respectively.

126.   There are questions of law and fact common to Plaintiffs and the Classes that predominate over any questions affecting only individual members of the class. These common questions of law and fact include, but are not limited to, the following:

a.   Whether Defendants intentionally drew Filipino nurses into a trap:

32

    i.  by having them sign the ICP Agreement, which contained financial penalties if the nurses did not continue with the process through completion; and

    ii.  once the Filipino nurses faced those penalties and therefore could not withdraw without suffering serious financial harm, requiring them to sign the NHC Agreement, which included the substantially greater Liquidated Damages Penalty and Noncompetition Penalty if the nurses left their employment before three years;

b.      Whether Defendant NHC engaged in a policy and practice of failing to pay Filipino nurses the prevailing wage corresponding to the work they performed;

c.      Whether Defendant NHC engaged in a policy and practice of employing Filipino nurses in positions not commensurate with those for which they were paid and hired;

d.      Whether Defendant NHC engaged in a policy and practice of employing Filipino nurses under unsafe working and patient conditions;

e.      Whether Defendants engaged in a policy and practice of intentionally engaging in and/or allowing discrimination against Filipino nurses on the basis of race, ethnicity, and/or citizenship;

f.      Whether Defendants engaged in a policy and practice of requiring Filipino nurses to sign the Liquidated Damages Penalty, in violation of applicable law;

g.      Whether Defendants engaged in a policy and practice of using the Liquidated Damages Penalty to coerce Filipino nurses to continue working for NHC;

h.      Whether Defendants engaged in a policy and practice of using the Noncompetition Penalty to coerce Filipino nurses to continue working for NHC;

i.      Whether the Defendants engaged in a policy and practice of using misrepresentation and fraud to hide their illegal agreements from the U.S. and Filipino governments;

j.      Whether the Defendants are a "venture" within the meaning of the TVPA;

k.      Whether Defendants are an "enterprise" within the meaning of the RICO;

l.      Whether Defendants NHC and ICP are an "enterprise" within the meaning of the RICO;

m.      Whether Defendants engaged in a policy and practice of using threats of financial, reputational, and/or psychological harm to coerce Filipino nurses to continue working for them;

n.      Whether Defendants engaged in a policy and practice of actual and threatened legal process to coerce Filipino nurses to continue working for them;

o.      Whether ICP conspired with NHC to commit forced labor and trafficking for forced labor;

p.      In the alternative, whether Defendants attempted to commit forced labor and trafficking for forced labor;

q.      Whether Defendants breached their contracts with the Filipino nurses;

r.      Whether Defendants committed fraud in their contracts with the Filipino nurses;

s.      Whether ICP's misrepresentations that immigration services would be offered free or provided by ICP was material and fraudulent;

34

t.        Whether Plaintiffs' and the Class members' reliance on ICP's representation that it would provide for immigration services resulted in damages;

u.        Whether the Defendants should be enjoined from using, enforcing, or threatening to enforce the ICP Agreement and the NHC Agreement;

v.        Whether the Classes can be made whole by the payment of damages; and

w.        Whether Defendants are liable to the Classes.

127.    Plaintiffs' claims are typical of the Classes.  Plaintiffs and all members of the Classes have sustained injuries and damages arising out of and proximately caused by the policies, practices, plan, and scheme of not paying the prevailing wage, engaging in discrimination based on their race and ethnicity, and using (and deliberately not disclosing to the Filipino government) the ICP Agreement penalty, the NHC Agreement Liquidated Damages Penalty and Noncompetition Penalty, and threats of legal process and financial, reputational, physical, and/or psychological harm to intimidate them.

128.    Plaintiffs will fairly and adequately represent the interests of the members of the Classes.  Plaintiffs' counsel is competent and experienced in litigating complex employment and labor trafficking class actions.

129.    A class action is superior to other available means for fair and efficient adjudication of this controversy.  Each member of the Classes has been damaged and is entitled to recovery because Defendants' illegal policies, practices, scheme, and plans applied generally and equally to all members of the Classes. Individual joinder of all members of the Classes is not practicable, and questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.   Class action treatment will allow those similarly situated persons to litigation their claims in the manner that is most efficient and economical for the parties

35

and the judicial system. Upon information and belief, Defendants have electronic records and data that will make identification of specific members of the Classes relatively simple. The propriety and amount of punitive damages and declaratory, injunctive, or other equitable relief is based on Defendants' intentional and continuous conduct, which is common to the Classes.

## C.    Wage Claims (Against NHC)

130.    NHC provided the Plaintiffs and other similarly situated Filipino nurses with a "housing stipend" to pay for housing during their first month of employment.

131.    NHC customarily provided this "housing stipend" as an addition to the wages they paid to the Plaintiffs and other similarly situated Filipino nurses.

132.    In calculating overtime premiums, NHC did not include the "housing stipend" as part of the Plaintiffs' and other Filipino nurses' regular rate of pay.

133.    Therefore, NHC did not pay overtime premiums at a rate one-and-a-half the regular rate of pay, including the housing stipend.

134.    NHC required Plaintiffs and other Filipino nurses to perform work that required a higher skill level than what corresponded to the required prevailing wage NHC paid.

135.    NHC did not base its calculation of overtime premiums on this higher required prevailing wage, which should have been the regular rate of pay.

136.    Therefore, NHC did not pay overtime premiums at a rate of one-and-a-half the regular rate of pay.

## D.  FLSA Claims on Behalf of Similarly Situated Nurses

137.    Plaintiffs bring their FLSA claims on behalf of themselves and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required

36

overtime wages at Defendants' operations during the three-year period preceding the filing of this lawsuit.

138.    The FLSA collective is comprised of all nurses who were recruited by the Defendants from the Philippines and were employed with NHC within the United States at any time on or after May 6, 2021 (the "Class").

139.    There is a strong likelihood the Plaintiffs and other Filipino nurses were subject to the same policies and practices of Defendant NHC with respect to underpayment of overtime at the rate of one-and-a-half times the regular rate of pay, including the housing stipend,  and/or the appropriate prevailing wage.

140.    Therefore, there is a strong likelihood that other Filipino nurses subject to the same policies and practices of Defendant NHC are similarly situated to the Plaintiffs.

141.    Common proof applicable to Plaintiffs and other Filipino nurses in FLSA collective will show that Defendant NHC failed to properly pay them overtime wages as required by the FLSA.

142.    Plaintiffs believe that there are hundreds of other similarly situated workers who suffered from Defendants NHC's FLSA violations (*see* ¶ 125, *supra*).  Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA collective, but this information is readily ascertainable from the Defendants' records.

143.    Through this lawsuit, Defendant NHC is informed of the Plaintiffs' FLSA claims and therefore "may glean the 'generic identities' of the [prospective FLSA plaintiffs] and the "subject matter and size" of the litigation."[6]

---

[6]    *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1014 (6th Cir. 2023) (Bush, J., concurring) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)).

144.     The FLSA statute of limitations should be equitably tolled for all similarly situated Filipino nurses from the date this lawsuit was filed until the Court determines there is a strong likelihood the Plaintiffs and other Filipino nurses are similarly situated.

145.     The Defendants therefore should be required to provide Plaintiffs with a list—including last known addresses, telephone numbers, email addresses, and messaging (such as WhatsApp) contact information, if known—of all similarly situated Filipino nurses.

146.     Plaintiffs should be permitted to distribute Court-authorized notice of the FLSA action to all Filipino nurses the Court determines are similarly situated to the Plaintiffs.

## V.     CAUSES OF ACTION

### COUNT I
### Trafficking Victims Protection Act
### (Class Claim Against All Defendants)

147.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

148.     This cause of action sets for Plaintiffs' and other Filipino nurses' claims against all Defendants under the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, in that:

    a.     Plaintiffs and other Filipino nurses are victims of violations of the following provisions of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589 (forced labor) and 1590 (trafficking for forced labor);

    b.     Defendants were perpetrators of the foregoing violations; and

    c.     Defendants knowingly benefited financially from participation in a venture they knew or should have known engaged in the foregoing violations. *See* 18 U.S.C. § 1595(a).

38

149.     In violation of 18 U.S.C. § 1589, Defendants knowingly provided and/or obtained Plaintiffs' and other Filipino nurses' labor or services by means of:

        a.      Physical restraint and/or threats of physical restraint;

        b.      Serious harm and/or threats of serious harm;

        c.      Abuse of legal process and threats of abuse of legal process; and/or

        d.      A scheme, plan, or pattern intended to cause Plaintiffs and other Filipino nurses to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint.

150.     In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants, directly or through their agents, knowingly recruited, transported, provided, and/or obtained Plaintiffs and other Filipino nurses for labor or services in furtherance of the Defendants' violations of 18 U.S.C. § 1589.

151.     In violation of 18 U.S.C. § 1594(b), some Defendants violated 18 U.S.C. §§ 1589 and 1590 and some Defendants conspired to violate 18 U.S.C. §§ 1589 and 1590.

152.     Alternatively, in violation of 18 U.S.C. § 1594(a), Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590.

153.     Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

154.     Under the TVPA, Plaintiffs and other Filipino nurses are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including but not limited to:

        a.      compensation at the promised wage rate including all applicable overtime

wages for the work done while employed by Defendants;

b.      compensation for all additional pecuniary losses proximately caused by Defendants' violations of the TVPA;

c.      other compensatory damages, including compensation for physical and emotional injuries;

d.      punitive damages; and

e.      attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

<u>**COUNT II**</u>
**Tennessee Human Trafficking Act**
**(Class Claim Against All Defendants)**

155.      Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

156.      This cause of action sets for Plaintiffs' and other Filipino nurses' claims against all Defendants under the civil remedies provision of the Tennessee Human Trafficking Act ("THTA"), Tenn. Code Ann. § 39-13-314, in that:

a.      Plaintiffs and other Filipino nurses are a victim of violations of the following provisions the THTA: Tenn. Code Ann. § 39-13-307 (involuntary labor servitude) and § 39-13-308 (trafficking persons for forced labor or services);

b.      Defendants were perpetrators of the foregoing violations; and

c.      Defendants committed, commenced, and/or consummated their offenses against Plaintiffs and other Filipino nurses under the THTA in Davidson County and/or Rutherford County, in the State of Tennessee. *See* Tenn. Code Ann. § 39-11-103.

157.      In violation of Tenn. Code Ann. § 39-13-307, Defendants knowingly subjected or attempted to subject Plaintiffs and other Filipino nurses to forced labor by means of:

a. Physical restraint and/or threats of physical restraint;

b. Abuse of legal process and threats of abuse of legal process; and

c. Using or threatening to cause financial harm and/or extortion for the purpose of exercising financial control over the Plaintiffs and other Filipino nurses.

158. In violation of Tenn. Code Ann. § 39-13-308, and in addition to the violations of Tenn. Code Ann. § 39-13-307 set forth above, Defendants knowingly:

a. Recruited, enticed transported, provided, and/or obtained—or attempted to do so—Plaintiffs and other Filipino nurses intending or knowing the Plaintiffs and other Filipino nurses would be subjected to involuntary labor services;

b. Benefitted, financially or by receiving anything of value, from participation in a venture that has engaged in violations of the prohibition against involuntary labor or services; and

c. Agents of the corporate defendants NHC And ICP (including but not limited to Defendants Smith, Wong, and/or Does 1-10) performed the conduct that is an element of § 308 while acting within the scope of agent's office or employment and on behalf of the corporate defendants, and the commission of the conduct was authorized, requested, commanded, performed, and/or within the scope of the agent's employment on behalf of the corporation or constituted a pattern of illegal activity that an agent of the corporations knew or should have known was occurring. *See* Tenn. Code Ann. § 39-13-311.

159. Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

160. Under the THTA, Plaintiffs and other Filipino nurses are entitled to recover

41

damages in an amount to be proven at trial, including but not limited to:

       a.     Medical expenses, including psychological treatment;

       b.     Costs of necessary housing, transportation, and child care;

       c.     The greater of: (1) compensation at the promised wage rate including all applicable overtime wages for the work done while employed by Defendants; or (2) the gross income or value to Defendants of Plaintiffs' and other Filipino nurses' labor or services while in the human trafficking situation;

       d.     compensation for any and all additional losses proximately caused by Defendants' violations of the THTA;

       e.     other compensatory damages, including compensation for physical and emotional distress, pain, and suffering;

       f.     punitive damages; and

       g.     attorneys' and experts' fees and costs.

161.    Plaintiffs also are entitled to an injunction prohibiting Defendants from engaging in further violations of the THTA.

<u>**COUNT III**</u>
**Racketeer Influenced and Corrupt Organizations Act**
**(Class Claim Against All Defendants)**

162.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

163.    This Count sets forth claims by Plaintiffs and other Filipino nurses against all Defendants for damages resulting from Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68.

42

164.     Each Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

165.     Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

166.     The RICO Enterprises, as defined above (at paragraphs 29-31), are association-in-fact enterprises with the common purpose of securing a captive workforce of nurses for employment at facilities throughout the United States and to profit the nurses' labor.

167.     The RICO Enterprises engaged in and affected interstate commerce.

168.     The RICO Enterprises function as continuing units.

169.     The Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprises, through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

170.     Each of the Defendants also participated in the operation or management of the respective enterprise itself, directing the activity of the enterprise.

171.     Specifically, the Defendants conducted or participated and/or conspired to do so in the affairs of the respective RICO Enterprises by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

a.     Labor trafficking, in violation of 18 U.S.C. §§ 1589 and 1590; and

b.     Extortion, in violation of Tenn. Code Ann. § 39-14-112.

### ***Predicate Acts***

TVPA Violations: 18 U.S.C. §§ 1589, 1590, and 1595

172.     As set forth in paragraphs 38-118, the Defendants, through the RICO Enterprises, knowingly provided and/or obtained Plaintiffs' and other Filipino nurses' labor or services, and

43

subjected them to forced labor in violation of 18 U.S.C. § 1589; recruited, transported, provided, and obtained Plaintiffs' and other members of the Classes for the purpose of forced labor in violation of 18 U.S.C. § 159; and knowingly benefited financially from participation in a venture it knew or should have known was engaged in forced labor and trafficking for forced labor, as set forth in 18 U.S.C. § 1595.

<u>Extortion: Tenn. Code Ann. § 39-14-112</u>

173.    Defendants, through the RICO Enterprises, used coercion with the intent to obtain Plaintiffs' and other Filipino nurses' services, to gain financial advantage, and to restrict Plaintiffs' and other Filipino nurses' freedom of action and free exercise or enjoyment of their rights and privileges under the U.S. and Tennessee Constitutions and laws of Tennessee, including the freedom to seek other employment.

174.    Specifically, the Defendant NHC used physical restraint and threatened physical restraint, and all Defendants used the actual and threatened enforcement of the ICP Agreement damages provision and the NHC Agreement Liquidated Damages Penalty, Noncompetition Penalty, and other associated fees with the intent to make the Plaintiffs fear coercive retribution of they left their employment with Defendant NHC and started to work elsewhere.

### *Pattern of Related Racketeering Acts*

175.    Defendants, through the RICO Enterprises, engaged in the racketeering activity described in this claim repeatedly throughout the entire period of their association-in-fact, which, upon information and belief, began in 2019 and continues until the present.

176.    The pattern affected hundreds of individuals, accomplishing its purposes on dozens of occasions during the period of the pattern of racketeering acts.

177.    Defendants, through the RICO Enterprises, rely on the racketeering acts described

44

in this Complaint to conduct their regular business activities.

178.   Defendants, through the RICO Enterprises, continue to engage in the racketeering acts and threaten to repeat and extend the racketeering acts indefinitely into the future.

179.   Defendants' racketeering acts have or had similar purposes: to profit from the Plaintiffs' and other Filipino nurses' coerced labor.

180.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiffs and other members of the Classes, including underpayment of wages, lost employment opportunities, legal fees and costs, and other out-of-pocket costs.

181.   As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Defendants and their agents.

182.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, directed their racketeering activities at similar individuals and entities: Plaintiffs and other Filipino nurses.

183.   The Defendants' acts have or had similar methods of commission, such as common recruitment tactics and use of similar employment practices and policies with respect to Plaintiffs and other Filipino nurses.

### *Conspiracy*

184.   As set forth in paragraphs 39-118, Defendants conspired to violate the RICO, by agreeing to participate in the objectives of the Enterprises to engage in the pattern of racketeering activity.

### *Injury and Remedies*

185.   As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs and Filipino nurses have suffered injuries to

their property, including but not limited to transportation costs in the Philippines, unreimbursed housing and transportation costs in the United States, incidental relocation expenses, wage underpayments, lost employment opportunities, legal fees and costs associated with Defendants' liquidated damages enforcement actions, the actual payment of some or all the liquidated damages, and/or other pecuniary losses.

186. Plaintiffs and other members of the Classes are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

a. compensation for their injuries to their property;

b. trebling of the damages set forth in subparagraph (a), *supra*; and

c. attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

187. Plaintiffs are entitled to recover their reasonable attorney's fees and costs of litigation.

**Count IV**
**Civil Rights Act of 1866**
**(Class Claim Against All Defendants)**

188. Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

189. The Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute further defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b).

46

190.    Thus, Section 1981 prohibits discrimination in the making and enforcement of contracts on the basis of race, color, ancestry, ethnicity, alienage, or citizenship.  *E.g.*, *St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) ("Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination . . . because of their ancestry or ethnic characteristics."); *Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179 (9th Cir. 2024) (discussing discrimination based on citizenship under Section 1981); *Ali v. Advance Am. Cash Advance Ctrs., Inc.*, 110 F. Supp. 3d 754 (E.D. Mich. 2015) ("Section 1981 . . . provides a cause of action for alleged discrimination on the basis of race, alienage, ancestry or ethnic characteristics.").

191.    This cause of action sets forth Plaintiffs' and other Filipino nurses' claims against Defendants under Section 1981, in that:

a.      Defendants discriminated in the making and enforcement of contracts, including the making, performance, modification, and termination of the contractual relationship between Defendant NHC and Plaintiffs and other Filipino nurses, based on race, ethnicity, alienage, and/or and citizenship, as set out in the paragraphs above;

b.      Defendants subjected Plaintiffs and other Filipino nurses to contracts, in the form of the ICP Agreement and NHC Agreement, to which similarly situated comparators who were not Asian, Filipino, and/or non-citizens were not subjected, as set out in the paragraphs above;

c.      Defendant NHC, with the knowledge of ICP, subjected Plaintiffs and other Filipino nurses to terms and conditions of employment to which similarly situated comparators who were not Asian, Filipino, and/or non-citizens were not subjected, as set out in the paragraphs above;

47

d. Defendants retaliated against Plaintiffs and other Filipino nurses for opposing such discrimination and/or participating in activity opposing discrimination, including by harassing and making threats against them;

e. Defendants are vicariously liable for the actions of their managers as well as directly liable for their own discriminatory actions; and

f. Defendants violations were intentional, malicious, and/or done with reckless indifference to Plaintiffs' and other Filipino nurses' federally protected rights.

192. Under Section 1981, Plaintiffs and other Filipino nurses are entitled to recover damages in an amount to be proven at trial, including but not limited to:

a. Compensation for all pecuniary losses proximately caused by Defendants' violations;

b. Other compensatory damages, including compensation for physical and emotional distress, pain, and suffering;

c. Punitive damages; and

d. Attorneys' and experts' fees and costs.

<u>**Count V**</u>
**Fair Labor Standards Act**
**(FLSA Overtime)**
**(Plaintiffs and Similarly Situated Filipino Nurses Against Defendant NHC)**

193. By this reference, Plaintiffs incorporate the above factual statements as if fully stated herein.

194. This count sets forth a claim by Plaintiffs, and by all similarly situated workers who opt into this action pursuant to 29 U.S.C. § 216(b), for damages resulting from Defendant NHC's violations of the FLSA overtime requirements, 29 U.S.C. § 207.

48

195.    At all relevant times Defendant NHC employed Plaintiffs and all similarly situated workers at its facilities throughout the United States.

196.    Defendant NHC was Plaintiffs' and all similarly situated workers' employer under the FLSA.

197.    Plaintiffs and all similarly situated workers were at all times nonexempt workers whose employment was subject to the minimum wage, overtime, and recordkeeping requirements of the FLSA.

198.    The Plaintiffs and the other similarly situated workers regularly worked more than forty hours in a single work week.

199.    Defendant NHC failed to pay Plaintiffs and other similarly situated workers overtime premiums at the rate of one-and-a-half times their regular rate of pay for every hour they worked above forty in a work week.

200.    Defendant NHC's failure to pay an overtime premium based on its employees' regular rate of pay for hours above forty in a work week violated the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

201.    Defendant NHC's violations of the overtime provisions of the FLSA were willful.

202.    The Plaintiffs and the other similarly situated workers are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendant NHC's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

203.    Plaintiffs and other similarly situated workers are also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

204.    Plaintiffs and the other similarly situated workers also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

## Count VI
## Breach of Contract
### (Plaintiffs and Similarly Situated Filipino Nurses Against All Defendants)

205.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

206.    This cause of action sets forth Plaintiffs' and other Filipino nurses' claims against Defendants under state contract law, in that:

      a.    Defendants entered into contracts with Plaintiffs and similarly situated Filipino nurses, in the form of the NHC Agreement and ICP Agreement;

      b.    Plaintiffs and similarly situated Filipino nurses substantially performed under the contracts;

      c.    ICP breached the ICP Agreement by failing to provide Plaintiffs and similarly situated Filipino nurses with immigration services for free or at ICP expense;

      d.    NHC breached the NHC Agreement by, *inter alia*, (i) failing to provide Plaintiffs and similarly situated Filipino nurses with "full time" work; (ii) requiring them to perform work outside the agreed upon services; (iii) failing to provide compensation in compliance with "the prevailing wage rate for registered nurses, taking into account Employee's related work experience"; (iv) attempting to recover fees other than "employer expenses," and (v) discriminating against Plaintiffs and similarly situated Filipino nurses;

      e.    Defendants breached the ICP and NHC Agreements by violating the covenants implied in all contracts by operation of law, such as, *inter alia*, good faith and fair dealing.

      f.    As a result of Defendants' breach, Plaintiffs and similarly situated Filipino nurses have suffered and continue to suffer damages, in amounts to be determined at trial.

g.      Plaintiffs and similarly situated Filipino nurses are entitled to compensatory and punitive damages for breach of contract, in amounts to be determined at trial.

207.    The contracts should be construed under applicable state law, as set out in those agreements.

208.    To the extent that there is ambiguity in the ICP and NHC Agreements, such ambiguity should be construed against Defendants as the drafters of those agreements, and in favor of Plaintiffs and similarly situated Filipino Nurses.

209.    Defendants' violations were intentional, malicious, fraudulent, and/or done with reckless indifference to Plaintiffs' and other Filipino nurses' rights.

210.    Due to the Defendants' breach of contract, Plaintiffs and other Filipino nurses are entitled to recover damages in an amount to be proven at trial, including but not limited to:

a.      Specific performance and/or compensation for Defendants failure to perform;

b.      Compensation for all pecuniary losses proximately caused by Defendants' violations;

c.      Other compensatory damages, including compensation for physical and emotional distress, pain, and suffering;

d.      Punitive damages; and

e.      Attorneys' and experts' fees and costs.

### Count VII
### Fraud under Tennessee Law
### (Plaintiffs and Similarly Situated Filipino Nurses Against ICP)

211.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

51

212.     This cause of action sets forth Plaintiffs' and other Filipino nurses' claims against Defendants for fraud under Tennessee law, in that:

a.     ICP entered into the ICP Agreement with Plaintiffs and similarly situated Filipino nurses, which stated that it was governed by Tennessee law;

b.     ICP made the same intentional misrepresentation about material facts regarding ICP's services to all Plaintiffs and Class members by claiming that immigration services would be provided "free" or "from ICP";

c.     Such representations related to an existing or past fact or, in the alternative, embodied a promise of future action without the present intention to carry out the promise, in that ICP knew at the time the representations were made that NHC would shift the cost of these services to Plaintiffs and similarly situated Filipino nurses through the NHC Agreement;

d.     Such representations were made knowingly, without belief in their truth, and/or with reckless disregard to their truth or falsity;

e.     Plaintiffs and similarly situated Filipino nurses all reasonably relied on ICP's misrepresentations;

f.     As a result of their reliance, Plaintiffs and similarly situated Filipino nurses all suffered damages, in amounts to be determined at trial;

g.     These misrepresentations were made for the purpose of inducing the Plaintiffs and similarly situated Filipino nurses into accepting the NHC Agreement and the Defendants' joint labor trafficking scheme; and

52

h.    NHC was a participant in ICP's fraud, which was made with the knowledge and for the benefit of NHC and as part of and in furtherance of the Defendants' joint labor trafficking or forced labor scheme.

213.    ICP's fraud was intended to, and did, induce, influence, persuade, or engage Plaintiffs and similarly situated Filipino nurses to come to the State of Tennessee to work for NHC through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and character of the work to be done, or the amount and character of compensation to be paid for the work, or the sanitary or other conditions of the employment. *See* Tenn. Code Ann. § 50-1-102.

214.    Through these actions, Defendants violated Tennessee law against fraudulent misrepresentation.

215.    Through these actions, Defendants violated Tennessee law against promissory fraud.

216.    Through these actions, Defendants violated Tenn. Code Ann. § 50-1-102.

217.    Due to the Defendants' fraud, Plaintiffs and other Filipino nurses are entitled to recover damages in an amount to be proven at trial, including but not limited to:

a.    Compensation for all pecuniary losses proximately caused by Defendants' violations;

b.    Other compensatory damages, including compensation for physical and emotional distress, pain, and suffering;

c.    Punitive damages; and

d.    Attorneys' and experts' fees and costs.

53

## VI.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order:

a. Assuming jurisdiction over this action;

b. Certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

c. Declaring there is a strong likelihood that other Filipino nurses subject to the same policies and practices of Defendant NHC with respect to underpayment of overtime at the rate of one-and-a-half times the regular rate of pay;

d. Ordering Defendant NHC to provide contact information for all similarly situated Filipino nurses, authorizing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible workers who choose to do so to opt-in to the FLSA claims in this action;

e. Declaring that the statute of limitations should be equitably tolled for similarly situated Filipino nurses who opt into the FLSA claims in this action, from the date this lawsuit was filed until the Court authorizes notice;

f. Declaring that Defendants violated the TVPA;

g. Declaring that Defendants violated the THTA;

h. Declaring that Defendants violated the RICO;

i. Declaring the Defendants violated Section 1981;

j. Declaring that Defendant violated state contract and fraud laws;

k.  Declaring that Defendant NHC violated the FLSA overtime provisions;

l.  Permanently enjoining Defendants from further violations of the TVPA, the THTA, Section 1981, and RICO;

m.  Permanently enjoining Defendant NHC from further violations of the FLSA;

n.  Granting judgment to Plaintiffs and other members of the Classes on their TVPA claims and awarding them compensatory and punitive damages;

o.  Granting judgment to Plaintiffs and other members of the Classes on their THTA claims and awarding them compensatory damages, the greater of their wage underpayments or the gross income or value to Defendants of Plaintiffs' and other Filipino nurses' labor or services, and punitive damages;

p.  Granting judgment to Plaintiffs and other members of the Classes on their RICO claims and awarding them actual damages, trebling of these damages, and interest;

q.  Granting judgment to Plaintiffs and other members of the Classes on their Section 1981 claims and awarding them actual damages, punitive damages, compensatory damages, and interest;

r.  Granting judgment to Plaintiffs and other members of the Classes on their state law contract and fraud claims and awarding them actual damages, punitive damages, compensatory damages, and interest;

s.  Granting judgment to Plaintiffs and other similarly situated workers who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

t.   Awarding Plaintiffs and other Filipino nurses their costs and reasonable attorneys' fees; and

u.   Granting such further relief as the Court finds just.

Respectfully submitted,

_s/ Caraline E. Rickard_
RICKARD MASKER, PLC
Caraline E. Rickard (TN Bar No. 034414)
Curt M. Masker (TN Bar No. 037594)
810 Dominican Drive, Suite 314
Nashville, Tennessee 37228
Telephone: (615) 200-8389
Facsimile: (615) 821-0632
caraline@maskerfirm.com
curt@maskerfirm.com

RADFORD SCOTT, LLP
Daniel Werner* (GA Bar No. 422070)
Justin M. Scott* (GA Bar No. 557463)
125 Clairemont Ave., Suite 380
Decatur, Georgia 30030
(678) 271-0300
dwerner@radfordscott.com
jscott@radfordscott.com

*Admitted pro hac vice

*Attorneys for Plaintiffs and the Proposed Class*

56

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was filed via ECF, which will cause service to be sent to the following on September 3, 2024:

Kristin Titley (TN BPR No. 036596)
CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
750 Old Hickory Blvd., Suite 260-2
Nashville, TN 37219
(615) 340-3806
ktitley@constangy.com

Sarah M. Phaff* (GA Bar No. 140626)
W. Jonathan Martin II* (GA Bar No. 474590)
CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
230 Peachtree Street, N.W., Suite 2400
Atlanta, GA 30303
(404) 230-6777
sphaff@constangy.com
jmartin@constangy.com
*Admitted pro hac vice*

*Attorneys for NHC Defendants*


Mark W. Peters
Flynne M. Dowdy
Arianna Robbins
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, TN 37219
(615) 850-8888
markwpeters@hklaw.com
flynne.dowdy@hklaw.com
arianna.robbins@hklaw.com

*Attorneys for Infinity Care Partners, LLC*


                                        s/ Caraline E. Rickard